THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* IKE BARTLEY, Plaintiff in Error.

*Opinion filed April 23, 1914.*

1. CRIMINAL LAW—*when homicide is not murder.* To constitute a homicide murder, where the homicide was the result of a fight with weapons, the accused must have had a sufficient time between the provocation and the homicide to become calm and cool, and an opportunity for deliberation, as a reasonable man, as to the consequences that were likely to follow any of his acts, and if the elements of a malicious and premeditated homicide are lacking the homicide is manslaughter.

2. SAME—*what facts do not show time for deliberation.* A sufficient time to cool and to deliberate is not shown where the deceased and the accused had been fighting near the accused's house, one using a part of an old harrow and the other a piece of an endgate of a wagon, and, after both had been knocked down, the accused immediately entered the house, procured and loaded a gun, met the deceased at another entrance and shot him, apparently while the latter was in the act of striking accused with an ax.

3. SAME—*when a conviction for murder will be set aside.* A conviction for murder will be set aside where the evidence entirely fails to establish the crime of murder, as charged, and shows only manslaughter, at most, to have been committed, even though no instructions defining manslaughter or pointing out the difference between murder and manslaughter were given.

4. SAME—*when exclamation by wife may be proved as part of the res gestæ.* As a part of the *res gestæ* it may be shown, on a trial for murder, that the wife of the accused, who had been standing by while her husband and her brother were engaged in a fight with clubs, exclaimed to her brother, as her husband started toward the house, "Sam, Ike is gone to get his gun," to which the brother replied, "I will get the ax."

5. INSTRUCTIONS—*what an instruction presenting law of self-defense should contain.* An instruction upon the law of self-defense should be in the language of section 149, coupled with the language of section 148, of the Criminal Code, defining circumstances that are necessary to excite the fears of a reasonable man.

WRIT OF ERROR to the Circuit Court of Fayette county; the Hon. J. C. MCBRIDE, Judge, presiding.

F. M. GUINN, for plaintiff in error.

P. J. LUCEY, Attorney General, J. G. BURNSIDE, State's Attorney, and EUGENE P. MORRIS, for the People.

Mr. JUSTICE CRAIG delivered the opinion of the court:

Plaintiff in error was convicted in the circuit court of Fayette county of the crime of murder. The jury fixed his punishment at nineteen years in the penitentiary, and he was sentenced accordingly. He has sued out a writ of error to review the record and judgment of the circuit court, and assigns as error the improper admission of evidence on behalf of the People and improper instructions offered on behalf of the People, and further contends that the evidence will not support a verdict of murder but only manslaughter, in any event.

The circumstances of the homicide were as follows: Plaintiff in error resided on a farm about three miles from the city of Vandalia, with his wife and family. About five o'clock in the afternoon of June 17, 1913, the deceased, Samuel Finley, who was a brother of plaintiff in error's wife, and John Deford, his wife's step-father, drove to the home of plaintiff in error. The house in which plaintiff in error resided is situated west of a road running past said premises and faces east towards said road. The house contains three rooms. The main part of the house has a sitting room at the south end and a bed-room at the north end. There is a kitchen extending along the west side of the house its entire length. The entrance to the kitchen from the yard is from a door at the south end. The outside entrance to the sitting room is a door at the east side, and there is a door connecting the kitchen and sitting room, and a door connecting the sitting room with the bed-room north of it. There is a north window and an east window in the bed-room. Plaintiff in error had left his team of horses hitched to a wagon standing just south of the house. He greeted Deford and Finley cordially upon their arrival, and they all walked down over plaintiff in error's cornfield and

then came back to the house. Plaintiff in error had a
bottle of alcohol in the house, from which they all drank.
Plaintiff in error, at the request of Finley, called up some
hound dogs and Finley talked about buying one. Finley
during the conversation asked plaintiff in error to give him
a job cutting ties, and plaintiff in error and Finlay finally
agreed upon the price plaintiff in error was to pay, and
Finley agreed to come to work the next day. Plaintiff
in error asked his wife to get the visitors some lunch,
which she did. Finley got up and went out into the gar-
den, and plaintiff in error's wife soon after got up and
followed him. Plaintiff in error said, "He is out there put-
ting devilment in the old woman's head, and I will go out
there." Deford advised him not to go, saying that Finley
would not do anything like that. They went out into the
yard, and Finley had at that time jumped over the gar-
den fence. Plaintiff in error said, "Come back, Sam; you
needn't run off mad." Finley came back and asked plain-
tiff in error for a chew of tobacco, which plaintiff in error
gave him. Plaintiff in error also noticed that one of the
shoes worn by Finley had no string in it, and he asked his
wife to go into the house and get a pair of shoe strings,
which she did, and Finley put one in one of his shoes.
As to what occurred immediately afterwards the evidence
is conflicting. Plaintiff in error claims to have overheard
some remarks between Finley and his wife about plaintiff
in error turning his wife down. Plaintiff in error said,
"I ain't turned her down; I think more of her than I ever
did." Finley said, "You're a damn liar," and hit him on
the jaw and knocked him down. Deford says there was
some conversation about a woman, and that plaintiff in er-
ror drew back to strike Finley and they went to fighting.
The son of plaintiff in error, a boy about fourteen years
of age, testifying as a witness on the part of the People,
said he heard his father call Finley a vile name, and that
Finley struck plaintiff in error and knocked him down.

These were the only witnesses who testified as to what led up to the trouble between Finley and plaintiff in error. It appears that Finley struck the first blow. At all events there was a struggle, and Finley got the plaintiff in error down and was choking, biting and gouging him. They fought on the ground for a few minutes, and Deford and McCaslin, a peddler, who had driven up just prior to the altercation but who was deaf and did not hear what they said, got Finley off plaintiff in error and separated the men. McCaslin was holding Finley and turned him towards the east. They were then just north of the house. Deford had plaintiff in error by the arm and pulled him towards the west. Finley picked up a part of an old harrow and came towards plaintiff in error. Plaintiff in error picked up a piece of an end-gate of a wagon lying in the yard. They both struck at each other and both were knocked down again, plaintiff in error receiving a blow on the neck and shoulder. They got on their feet, and plaintiff in error started around the west side of the house and Finley started around the east side. The wife of plaintiff in error, who was standing near by, said, "Sam, Ike is gone to get his gun." It is not shown that the plaintiff in error heard this remark and he denies that he heard it. It is the admission of this statement of the wife, testified to by different witnesses, that is objected to. Finley said, "I will get the ax." As to what happened immediately afterward there is a further conflict in the evidence. Plaintiff in error claims he went around the west side of the house and towards his team and wagon, with the idea of getting away from Finley; that Finley came around the east side of the house and met him about the south-east corner, near the front wheels of the wagon, and headed him off; that Finley had picked up an ax that was leaning against the house, and either struck him with the ax or threw it at him, from which plaintiff in error received a cut on his arm. After the shooting plaintiff in error exhibited a cut on his

arm which he claimed he received from the ax in the hands of Finley in this encounter. Whether this is true or not, after passing around the west side of the house plaintiff in error entered the kitchen door, took down a shot-gun which was hanging on the kitchen wall, went from the kitchen into the sitting room of the house and from there into the bed-room and got some cartridges, with which he loaded the gun. Finley started around the east side of the house and picked up the ax that was leaning against the house and started into the east door of the sitting room, where he met plaintiff in error, who partly raised the gun and fired the fatal shot. Plaintiff in error then leaned the gun against a sewing machine that stood near the door, came out, picked up the ax and went to town and gave himself up to the sheriff. He stated after the shooting that "he had to do it."

Finley was shot in the left breast, under the arm, and evidently at close range, as the shot did not scatter and made a wound about the size of an apple, according to the testimony of those who examined the body afterwards. There is evidence that Finley was left-handed, and from the nature of the wound it was such as would have been inflicted while he was in the position of raising the ax to strike plaintiff in error. The body of Finley, when picked up by the coroner afterward, was lying almost twelve feet east and a little south of the sitting room door. The witness McCaslin testified that Finley staggered east and south after he was shot. The ax was lying on the ground, after the shooting, about three or four feet from the door. It also appears from the evidence of the witness Good that Finley approached the east bed-room window with the ax raised while plaintiff in error was in the bed-room loading the gun. The team of plaintiff in error, which was standing south of the house, ran away during the fight, and it is the theory of the defense that the horses were frightened by the altercation between plaintiff in error and

Finley when plaintiff in error claims he was struck with the ax before he procured the gun, but it is more probable, as appears from the evidence of Johnnie Bartley, the son of plaintiff in error, that the team ran away when the gun was fired. Plaintiff in error testified that Finley, at the time, was thirty-one years of age and plaintiff in error was forty-five; that they had previously run foot races together, and Finley was able to out-run him.

From all the evidence it is entirely clear that Finley was attacking plaintiff in error with the ax, and was coming in the east door of the house, with the ax uplifted, ready to strike, when plaintiff in error fired the shot which killed him. The main question to be determined from the record is whether, under the circumstances shown, plaintiff in error was guilty of the crime of murder of which he was convicted.

Murder, by our statute, "is the unlawful killing of a human being, in the peace of the people, with malice aforethought, either express or implied. * * * Express malice is that deliberate intention unlawfully to take away the life of a fellow creature, which is manifested by external circumstances capable of proof. Malice shall be implied when no considerable provocation appears, or when all the circumstances of the killing show an abandoned and malignant heart." (Hurd's Stat. 1911, sec. 140, p. 788.) There is no proof, or claim of proof, of express malice on the part of plaintiff in error, nor was there shown implied malice, as the same is defined. It could not be said but that plaintiff in error had considerable provocation. He and Finley had fought and been separated. Finley first picked up a heavy piece of timber and struck plaintiff in error a severe blow. In the midst of the affray plaintiff in error procured his gun and loaded it. The only possible act of deliberation shown by plaintiff in error was in going around the house for his gun. If we disregard his testimony entirely that he was going to his team and wagon

for the purpose of getting away from Finley, and even if it be taken for granted that his motive was to procure his gun, hanging on the kitchen wall, the evidence shows that Finley had just struck him with a heavy club, and he knew he could not escape from Finley by running away, as Finley was able to out-run him. Besides, the law makes a distinction and allowance between what a reasonable person would do in the heat of passion or under great provocation and what the same person would do in cooler moments, and it is just this distinction that makes a homicide in one case murder and in another case manslaughter. It is true that the jury, from the evidence, have the right to say which crime has been committed, but when the evidence utterly fails to establish the crime of murder as charged and shows only manslaughter at most, then a verdict of murder should be set aside. The principal question to be determined is the state of mind of plaintiff in error at the time and immediately before he fired the shot. At that time Finley was coming toward him with a deadly weapon. When plaintiff in error fired he apparently did not have time to raise the gun to his shoulder in the usual position of aiming such a weapon. Under the circumstances there is an entire lack of the elements of a malicious and premeditated homicide.

In the case of *People* v. *Bissett*, 246 Ill. 516, this court held that it is indispensable to a conviction for murder that the killing be done with malice aforethought, express or implied, otherwise the offense, under the statute, is manslaughter. Manslaughter, in our Criminal Code, is defined as "the unlawful killing of a human being without malice, express or implied, and without any mixture of deliberation whatever. It must be voluntary, upon a sudden heat of passion, caused by a provocation apparently sufficient to make the passion irresistible, or involuntary in the commission of an unlawful act, or a lawful act without due caution or circumspection." (Hurd's Stat. 1911, sec. 143, p. 788.) This

is followed by section 144, which is as follows: "In cases of voluntary manslaughter, there must be a serious and highly provoking injury inflicted upon the person killing, sufficient to excite an irresistible passion in a reasonable person, or an attempt by the person killed to commit a serious personal injury on the person killing. The killing must be the result of that sudden, violent impulse of passion supposed to be irresistible; for if there should appear to have been an interval between the assault or provocation given, and the killing, sufficient for the voice of reason and humanity to be heard, the killing shall be attributed to deliberate revenge, and punished as murder."

There had been a serious and highly provoking injury inflicted upon plaintiff in error sufficient to excite an irresistible passion in a reasonable person, and there was an attempt by Finley to commit a serious personal injury upon plaintiff in error. Can it be said, under all the circumstances of this case, that from the time that the fight started between Finley and the plaintiff in error, the plaintiff in error had at any time prior to the killing, as a reasonable man, any opportunity for deliberation as to the consequences of any of his acts or that there was any mixture of deliberation whatever, or, as stated by the authorities on criminal law, had sufficient time elapsed since the provocation or injury for the accused to become calm and act coolly with reference to the consequences likely to ensue from his acts? The rule laid down in the American and English Encyclopedia of Law (vol. 21, 2d ed. p. 177,) is as follows: "If, however, the difficulty between the accused and the deceased had not terminated but the provocation and the homicide constitute parts of a single transaction, an interval of a few minutes does not constitute sufficient cooling time. An instance of this is where the accused, as soon as the provocation is given, goes a short distance for a weapon and immediately returns and strikes the fatal blow." The homicide in this case was manslaughter, if anything.

As to the admission in evidence of the statement of the wife of plaintiff in error, above referred to, such statements have been held admissible as part of the *res gestæ.  Gannon* v. *People,* 127 Ill. 507; *Lander* v. *People,* 104 id. 248.

The giving of the People's tenth instruction is assigned for error.   By this instruction the jury were informed that it must appear that at the time of the killing the danger to the defendant was so urgent and pressing that in order to save his own life or to prevent his receiving great bodily harm the killing of Finley was absolutely necessary, etc.   The instruction told the jury, in effect, that it must appear from the evidence, as the evidence appears to the jury, that the danger to the defendant was urgent, etc.   It is not the question whether the evidence shows the danger to be real or not.   The question is whether the circumstances are such that the defendant, as a reasonable man, believed, or was justified in believing, that he was in great danger.   The jury might believe from the evidence, or it might appear to the jury from the evidence, that at the time of the killing the defendant was in no danger whatever, whereas it might also appear from the evidence that the circumstances were such that he really believed he was in danger.   For this reason the giving of a similar instruction, which was in the language of section 149 of the Criminal Code, has been condemned unless there be included or coupled with it the language of section 148, which defines the circumstances necessary to excite the fears of a reasonable man.   (*Kinney* v. *People,* 108 Ill. 519, and cases cited.) It was, however, held in *Gainey* v. *People,* 97 Ill. 270, that the giving of such an instruction was not reversible error when there were other instructions that correctly set out the law of self-defense, and if the instructions, as a series, stated the law correctly.   We would not be inclined to reverse this case if the giving of the instruction complained of were the only error assigned.   An examination of the instructions, however, discloses that none were given de-

fining manslaughter or the difference between murder and manslaughter, or informing the jury in any way of the elements of the two crimes, so they might have found· either one was committed from the facts.

For the reasons given the judgment of the circuit court will be reversed and the cause remanded to that court for a trial *de novo.*

*Reversed and remanded.*