(No. 20872.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* PARALEE McNEAL *et al.* Plaintiffs in Error.

*Opinion filed December 17, 1931.*

EARL B. WILLIAMSON, and IRVINE R. WASSON, for plaintiffs in error.

OSCAR E. CARLSTROM, Attorney General, HENRY E. PRATT, State's Attorney, J. J. NEIGER, and LEO F. CAVANAUGH, for the People.

Mr. JUSTICE ORR delivered the opinion of the court:

At an early hour in the morning of September 26, 1930, Joseph Fisher Markey was shot and killed in a house of prostitution in the city of Peoria conducted by plaintiff in error Paralee McNeal, alias Lillian Guyett. Paralee McNeal, or "Diamond Lil," as she is commonly known, is a colored woman thirty-nine years of age. Four colored girls were inmates of Diamond Lil's resort, and the other plaintiff in error, Jonie Yelm, a white man fifty years old, was a handy man about the premises. At the conclusion of a jury trial in the circuit court of Peoria county, at which Diamond Lil and Yelm sought to justify the killing by pleas of self-defense, they were both found guilty of murder and each sentenced to serve a term of fourteen years in the penitentiary. This writ of error is sued out to reverse the judgment.

Of the errors assigned the three principally relied upon are, that the evidence failed to establish guilt beyond a reasonable doubt; that no instruction was given to define manslaughter and that certain erroneous instructions were given.

On the morning of September 26, 1930, a little after one o'clock, the deceased, Markey, and a companion by the name of Ervin Birren, went to a garage in Peoria and at their request the attendant, Harry Dexter, called a cab. While waiting for the cab Dexter told Markey he had lost a watch at No. 206 Eaton street, and Markey told Dexter he would get it for him. The cab arrived in charge of a driver named Harry Fulton. Birren and Markey entered the cab and went to No. 500 North Adams street, where Fulton and his two passengers entered a bootlegging place and each had a few drinks. Markey left, saying he was going down to Diamond Lil's resort, which was a short distance from the place where the drinks were obtained. The evidence shows that Markey preceded Fulton and Birren and had entered Diamond Lil's resort a short time be-

fore they arrived at the door. When Birren and Fulton reached this place it was about three o'clock in the morning. They were admitted by Bessie Tyler, a niece of Diamond Lil. When they entered the place there was some argument between Yelm and Markey concerning the disappearance of the watch. No blows were struck by Markey upon Yelm, who was sitting in a chair, but Yelm in the midst of the argument slipped off the chair into an adjoining bed-room. At this juncture Diamond Lil entered the room from a passageway which connects this room with the house next door, which is No. 202 Eaton street. She came through this passageway from No. 202 to a platform in No. 200, from which descent is provided by four steps to the floor level, where Markey was standing. At this time she had an automatic revolver strapped about her waist with a cord. Upon entering the room she began a tirade of abuse against Markey, cursing and uttering profanity, and at the same time ordering Lindquist, another young man working about the premises, to call the police. Birren and Bessie Tyler had left the room, Bessie intending to call the police and Birren arguing with her not to do so. Fulton remained in the room with Markey and Diamond Lil. Markey started walking towards Diamond Lil, and she stepped back a few steps with the drawn automatic in her hand and reached the platform from which she had a few minutes before entered the room. She continued her tirade of abuse of Markey as he stood at the foot of the steps, leaning on the rail leading to the platform. He then lighted and was smoking a cigarette, and as she continued her abuse he took one step on the stairs, whereupon she immediately began shooting. Three shots were fired as Markey went up the steps. At this point Fulton left the room, but before leaving attempted to step into the bedroom where Yelm had gone. Yelm there met him with a shot-gun, threatening to blow his head off, and Fulton then ran out of the place.

Markey was wounded with six bullets from the automatic, which, according to the testimony of Dr. E. C. Burhans, assistant county physician, all made a downward course through his body, one bullet wound being in his right chest, three bullet wounds in his left chest, one bullet passing through his heart and another through his hand. He also had a very large wound in his upper left arm which had been made by a gun-shot charge which tore off the muscles underlying the tissues, breaking the bone of the upper left arm. The evidence shows that the bullet wounds had been made by the automatic pistol in the hands of Diamond Lil and the gun-shot wound by a shot fired from a shot-gun by Yelm. Markey was dead when the first police officer, Zerwekh, arrived. Zerwekh, before the arrival of other police, asked who shot, and Yelm responded, "I shot." Yelm procured the shot-gun for Zerwekh from an adjoining room. Later, upon being questioned as to what had taken place and as to who owned the fire-arms used in the shooting, Yelm made a statement that he thought it was a hold-up and therefore shot Markey. Diamond Lil said she did not know who fired the pistol; that she heard the pistol shots and there was only one gun in the place, it being in her bed-room. She then went into her bed-room and procured a .38 Colt revolver, which she said was the only gun on the premises. This gun was fully loaded. The automatic pistol which was used in the shooting by her was found in the rear of the premises at No. 202 Eaton street, lying in a flower bed. In the clip of the gun was a small piece of silk cord, which later was found to be from the shawl Diamond Lil was wearing over her dress. This gun had been given to her by a local politician, Adolph Benz, Jr. After her arrest Diamond Lil at first denied all knowledge of the shooting and made a statement which was introduced in evidence in which she stated that three men came in and started to beat up Yelm; that two of the men pulled revolvers out of their pockets and shots be-

gan to ring; that she heard the report of a loud-sounding gun; that she thought they were stick-up men, and that the only gun in the house besides the shot-gun was the Colt police special .38. This statement, however, she refused to sign, and later made another statement which she did sign, and which, in substance, stated that three men came in, jumping onto one man and beating him up; that they had guns and would not let her out of the house, and that she started shooting to keep from being murdered, identifying a Remington automatic, upon the clip of which was a raveling of her shawl, as the gun she had used, and that she threw it out of the window after the shooting because she was frightened.

The testimony of Dr. E. C. Burhans, assistant county physician, relative to the effects of the shot-gun wound was, that the tearing of half the arm off and that of breaking the bone in his arm, and the shock that was associated with it, would have a tendency to hasten death; that the shot-gun wound of itself would not be fatal but contributed to and hastened death because of the additional shock. Diamond Lil testified that the three men who entered, Markey, Birren and Fulton, were armed. She was not certain just what was the nature of the weapons they had, and testified that at the time she shot Markey he was unarmed. Her niece, Bessie Tyler, also stated that two of the men were armed. Fulton, the taxicab driver, and Birren, the companion of Markey, both testified that they were unarmed and that Markey had no weapon of any kind. No weapon was found upon or near Markey after he was slain.

Diamond Lil's story of the shooting is that Markey advanced upon her and was attacking her; that she was falling, and as her hands slipped from the glass which was upon the wall of the platform between Nos. 200 and 202 she first realized that she had the automatic girded about her waist; that as she was falling she commenced shooting to protect herself, and that she fell under Markey, still

shooting, and was lying under him at the time Yelm shot Markey's left arm nearly off. This story does not ring true. If she were falling at the time she was shooting the course of the bullets in Markey would have been upward rather than downward, and if she had been lying under Markey as he was bleeding from the wounds she had inflicted she would have been smeared with the blood of these wounds, and would have been, no doubt, wounded from the shot fired by Yelm, which nearly severed Markey's left arm. The only spots appearing on her dress were a few fine pin-points, which she had much difficulty in finding for the jury.

Yelm states that he remained in the bed-room until after the revolver shots had ceased, when he saw Markey lying upon Diamond Lil in the passageway; that he then came out with the shot-gun and took careful aim and shot Markey in the left arm; that he fired his shot from the dance-hall floor, six or eight feet from the foot of the steps up which Markey and Diamond Lil had gone, while the evidence shows that if Markey was then lying on Diamond Lil his arm and shoulder were back of the passageway, toward the cellar stairs. If Markey perpetrated any assault upon Yelm he had ceased at the time Diamond Lil came into the room, and she then, by her cursing and display of the weapon, began an assault and provoked Markey to do whatever he did. There were no powder burns upon Markey, and her story that she was close to him and that he had hold of her at the time she was falling and shooting was thereby shown to be a falsehood. Markey, standing at the railing at the foot of the stairs, smoking a cigarette, could not have been making such an assault upon her as to cause her to be in fear of her life or in danger of bodily harm, as she contended. Nor is there any probable truth in her testimony that the three men who entered were armed with revolvers or that Markey had in his left hand a revolver or weapon of some kind. The evidence shows that

he was unarmed, and because of his intoxication was incapable of being a menace to Diamond Lil, Yelm, Lindquist, or any of the other inmates of the place. The demeanor of Diamond Lil and Yelm immediately after the shooting, their statements to the officers, and their endeavors to cover up and conceal the truth, all negative their pleas that the killing was justifiable and in self-defense. Diamond Lil's first statements that she had only one gun in the house, that she did not know who did the shooting, that Markey had a knife or gun in his hand, and that all three men were armed when they entered her resort, were all shown by the evidence to be falsehoods. The evidence shows that the three men were admitted to the house of ill-fame at three o'clock in the morning, and that Diamond Lil told someone to go up-stairs and call two girls for their company at about the time Markey and Yelm were having their altercation; that Markey, unarmed and drunk, then walked into the presence of Diamond Lil, who had an automatic pistol strapped about her, and that after an ensuing argument she fired six shots into his body. The circumstances shown do not warrant us in saying that the killing was justified or that the evidence failed to establish guilt beyond a reasonable doubt.

Complaint is made of the People's third instruction, although it is not set out as one of the errors relied upon to secure a reversal of this case. This instruction is a stock instruction relating to all the witnesses who testified and does not refer specifically to Jonie Yelm. It was not misleading, and there was no reason why such an instruction should refer to any particular witness or defendant. Under the facts in the case it was a correct instruction to the jury as to their being the judges of the credibility of the witnesses and the manner in which they should judge that credibility.

The giving of the sixth instruction, regarding self-defense, is set up as error because it is said the instruction

misled the jury as to who was the aggressor in the difficulty which led to the killing. The contention is made that it is not based upon the evidence in the case. This contention is erroneous, as the evidence shows that the altercation between Markey and Yelm had ended at the time Diamond Lil entered the premises and that no one was then being abused by Markey or anyone else. This instruction is also amply limited by many instructions given in behalf of defendants explaining self-defense and the matters of attack and provocation.

Criticism is made of the People's fourth instruction, relating to an accessory, the claim being that there is no justifiable inference from the evidence that any person kept watch, and that it is a controverted question whether the offense was committed by any of the defendants. The evidence here is clear that Yelm was an active participant in the shooting of Markey, and if the jury found that Paralee McNeal, alias Diamond Lil, was guilty of murder, Yelm would be an accessory to this crime. It is not a controverted question that the killing was done by any of the defendants, as claimed, as both on the stand admitted their part in the tragedy.

It is complained that the People's seventh instruction is erroneous, relating to the force used, when acting under a necessity apparent to the defendants, in their defense. No law is cited to show that this instruction is bad in form, but it is contended that it should not have been used in this particular case because an instruction defining manslaughter was not given. The record shows that, excepting forms of verdict, the court gave eight instructions for the People and twenty-three requested by the defendants. No instruction on manslaughter was presented or requested by the defendants. Several qualifying instructions on the same subject matter given for the defendants removed any question as to the propriety of this seventh instruction.

It is finally urged that the court erred in giving the People's eighth instruction, as follows:

"The court instructs the jury, as a matter of law, that before a defendant can avail himself of the right of self-defense, it must appear to a defendant that at the time of the killing the danger was apparently so urgent and pressing that in order to save his own life or to prevent his receiving great bodily harm, the killing was absolutely necessary or apparently necessary; and it must also appear that the person killed was the first assailant, or that the defendant had really and in good faith endeavored to decline any further struggle before the mortal wound was inflicted."

In support of their contention the defendants cite *People* v. *Bartley,* 263 Ill. 69, where a conviction for murder was set aside because the evidence showed that only manslaughter, at most, had been committed. In that case no instruction defining manslaughter, or the difference between murder and manslaughter, was given. But the facts in that case clearly distinguish it from the case here. In the *Bartley case* both participants were armed with dangerous weapons and had been assaulting each other prior to the time when one shot the other in the heat of passion. In the present case Diamond Lil came upon the scene after Markey's altercation with Yelm had ceased. Markey was not armed with any kind of weapon, and the evidence shows that at least ten minutes intervened between Yelm's disappearance into the bed-room and the shooting. During this time Diamond Lil is shown to have stood on the platform, four steps above, with the automatic pistol ready to fire. Under the circumstances shown by the evidence, this instruction, which has been approved in numerous decisions of this court, was properly given.

In their printed brief filed in this court defendants for the first time have alluded and objected to the service of several women on the jury. We have searched the record in vain for any challenge to the array, motion or other form

of objection to their service, either before, during or after the trial. The record shows that the jury was accepted to try the case. The motions in arrest of judgment and for a new trial are each silent of any such objection and neither is it mentioned in the assignment of errors. Under this state of the record no question concerning the jury is preserved for review.

Finding no reversible error in the record the judgment of the circuit court of Peoria county is affirmed.

*Judgment affirmed.*