(No. 37091.—■■■■■■■■)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* GAMILI IBOM, Plaintiff in Error.

*Opinion filed September 28, 1962.*

WILLIAM J. CALLAHAN, of Chicago, for plaintiff in error.

WILLIAM G. CLARK, Attorney General, of Springfield, and DANIEL P. WARD, State's Attorney, of Chicago, (FRED G. LEACH and E. MICHAEL O'BRIEN, Assistant Attorney's General, and JOHN T. GALLAGHER and MATTHEW J. MORAN, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE UNDERWOOD delivered the opinion of the court:

This case comes before us on writ of error to the criminal court of Cook County to review a judgment entered upon a jury verdict finding the defendant, Gamili Ibom, guilty of involuntary manslaughter. The defendant was sentenced to imprisonment in the penitentiary for a term of 1 to 14 years.

A number of errors are alleged to have occurred in the trial, but in the view which we take of the case there is no necessity for us to consider any assigned error other than the sufficiency of the proof to establish the guilt of the defendant beyond a reasonable doubt.

The defendant in this case, Gamili Ibom, is an exchange student in this country from Nigeria. He holds a Bachelor of Science degree from the University of Oregon, had re-

ceived a scholarship to return to the university on September 25, 1961, to finish work upon his master's degree in physics, and had been working as a bus driver to defray part of the cost of his schooling. On May 13, 1961, the defendant was employed by the Chicago Transit Authority as a bus driver and testified that he had been so employed for approximately one year, and was operating the Kedzie-California bus about 10:00 o'clock on the Saturday night in question. At that time John Hutt, a smallish man 65 years old, boarded the bus which defendant was driving at the Archer Avenue intersection. John Hutt was thereafter thrown or fell from the bus to the sidewalk, was taken to the hospital and there died. The People's theory of the case is that decedent boarded the bus, told defendant he did not have money to pay his fare, and that defendant thereupon shoved him out upon the sidewalk occasioning injuries to decedent's head which resulted in his death. The defendant contends decedent was intoxicated, refused to pay his fare, and that defendant then attempted to escort decedent down the steps and off the bus; that in the course of this action, decedent lost his balance and fell, striking the sidewalk.

The prosecution's testimony as to the alleged offense included Mrs. Hutt who testified that her husband was 65 years old and had been in good health, but who, on cross-examination, admitted that he had fallen and hurt his head approximately a month prior to the incident in question. Thaddeus Barnhill was the chief witness for the prosecution. He testified that he was a passenger on the bus, observed the decedent get on the bus and tell the bus driver that decedent did not have the correct fare for the bus and ask the driver to give him a lift for a few blocks; that the bus driver meanwhile had shut the doors and proceeded across Archer Avenue and that he then stopped, opened the bus doors and without any argument or "flusteration," the bus driver rose from his seat, placed his hands about the decedent's waist, and shoved him backwards out of the bus door; that as the

bus driver was starting to push the man out the door, the witness got up and told the bus driver, "Stop! Don't touch that man," and that when the man fell out of the bus, the witness was standing in the door exit looking down upon the bus driver and the decedent; that the driver of the bus then reached down and picked up the decedent's feet, which were still resting upon the bus steps and threw them out the door; that witness told the defendant he had better call the police, and that defendant left; that defendant was gone gone seven or eight minutes and then returned; that subsequently the fire department ambulance arrived and removed Hutt from the street. This witness also testified that when Hutt was picked up by the firemen, one of his hands went limp, opened up, and some change fell out of it; that the firemen picked up the change amounting to 22 cents and passed it to the police officer. On cross-examination it developed that this witness, who testified on direct examination that three people, the decedent and two women, got on the bus at Archer and Kedzie, had previously testified at the coroner's inquest in response to a question as to "Who got on the bus at Archer and Kedzie?", "One man got on the bus at Archer and Kedzie," and that the man was John Hutt. The witness also admitted that he had said nothing to the police about 22 cents falling out of the decedent's hand when the witness was later interviewed. At the coroner's inquest this witness had also testified that he arose from his seat after the bus driver had shoved the decedent out the door and then told the bus driver "not to bother that man any more."

In addition, Thaddeus Barnhill admitted on recross-examination that he had signed a statement for a representative from the Chicago Transit Authority in which he also stated that the decedent was the only one to get on the bus at the corner of Archer and Kedzie..

A second eyewitness for the prosecution was Katherine Gniadek, a woman who had a good deal of difficulty with

the English language. Many of her answers to the prosecutor's questions were completely unresponsive, and such intelligible testimony as she did give was largely in answer to leading questions.

As an illustration of the difficulty encountered in the testimony of the prosecution witness Katherine Gniadek, the following examples are taken from her direct examination.

"Q. Did anybody else get on the bus at that time outside of you and the other lady?

A. I don't——maybe ten, after ten, I don't know."
And then a little later the following:

"Q. And did you see a man get on the bus after you, and talk to the bus driver?

A. A man talked.

Q. Please talk loud so we can all hear you.

A. Yes, a man.

Q. A man got on?

A. Yes.

Q. And what did he do?

A. Call the police station, that is all.

Q. No, when this man got on the bus, did he talk to the bus driver?

A. He asked him, call police station for the man, and ask him for driver, you know. I can't — — —

Q. What if anything did you see this man do or what if anything did you see the bus driver do after this man got on the bus?

A. I don't know."

The coroner's physician, Dr. Harold Waggoner, testified that he was chief pathologist for the Cook County coroner's office and as such, performed a post-mortem examination on the body of John Hutt, the decedent. That in the course of that examination he found that there was a recent laceration with sutures in it on the back of the right side of the head and an older, healing laceration in that area but rising onto the crown of the head. Additionally, the doctor found

a recent hemorrhage on the left side of the skull, and a large, very old, subdural hemorrhage on the right side. That both temporal lobes and the frontal lobe on the left seemed to be the site of a very recent laceration, with softening and disruption of the tissue and hemorrhage in that area.

The medical opinion was that the hemorrhages were of traumatic origin, and that the death resulted from the traumatic cerebral contusions and lacerations to the brain occurring within two or three days of death. The doctor's opinion was also that the largest single apparent injury to the brain was the large hemorrhage which had occurred approximately two years prior to the doctor's examination and that this old hematoma might cause dizziness.

The doctor also found bruises to the right hip and right side of the chest which he estimated were at least a week old and could have been caused by a fall. The doctor's opinion was also that the head laceration, which did not have sutures, was several weeks old.

Another prosecution witness, John Delaney, one of the members of the fire department, testified that he had accompanied decedent to the hospital in the ambulance, and noticed the oder of alcohol upon his breath. He further testified that $11 was found upon the person of the decedent at the hospital.

The defendant testified that at the intersection with Archer Avenue several passengers got on the bus including decedent who had some difficulty negotiating the two steps to the driver's platform where the meter was situated, and that decedent just stood there hanging on to the post immediately behind the driver; that defendant told decedent that decedent would either have to pay his fare or leave the bus; that decedent mumbled something which defendant could not understand; that while the stop light changed color several times, defendant left his seat and walked over to decedent and told him that he could not ride the bus with-

out paying his fare; that decedent made no attempt to pay the fare, and defendant then attempted to escort decedent from the bus. That decedent then jerked his hand away and defendant went back and sat down in his seat; that cars behind defendant's bus were all honking, and defendant pulled the bus across the street, about half a block from the intersection, and there stopped the bus, again telling Hutt that he would have to pay his fare or leave the bus. Since decedent did nothing, defendant opened the bus door and attempted to escort decedent from the bus. Decedent held on to the post, but then took one step down and "took a swing" at defendant; defendant dodged the blow and decedent stepped down one more step, took another swing at defendant, lost his balance and fell from the bus. Defendant further testified that he noticed the advanced state of drunkenness of the decedent, attempted to lift decedent and requested Barnhill to assist him in lifting decedent to the sidewalk and giving him first aid; that the decedent's left leg was on the bus step and his right leg between the bus and the curb; that in order to move decedent's right leg, it was necessary to move the bus which defendant then did, moving it about two feet away from the curb, whereupon defendant went back and picked up Hutt and moved him farther up on the sidewalk, opened his shirt and jacket and started massaging his heart, a procedure which defendant had learned while employed at the Presbyterian-St. Luke's Hospital.

Defendant further testified that a man then came around and assisted defendant; that defendant told him to take care of Hutt while defendant went to call his dispatcher, which he then did, walking across the intersection to do so; that this dispatcher told defendant that the dispatcher would send the supervisor right way and that defendant should say nothing to the police or anyone else except that his supervisor was coming and to wait until the supervisor arrived before saying anything other than this.

Tom Vaughn testified that he was a passenger on the bus on the evening in question, and his testimony corroborated that of the defendant bus driver in substance.

Clarence Thomas, a member of the Chicago fire department, who was called to the scene of the accident in the fire department ambulance, also testified that he noticed the odor of liquor on the breath of the decedent. He testified that at the time he and his partner picked up the decedent to place him on the stretcher, he did not have any money in his hand, and he saw no money roll out of his hand onto the sidewalk as testified to by Barnhill.

Sophia Gazda testified in rebuttal that she was one of the two ladies who had boarded the bus with the decedent, and that she saw what occurred. She corroborated the prosecution's theory to some extent, but Mrs. Gazda also had some difficulty with the English language, and her testimony leaves something to be desired from the standpoint of clarity.

The undisputed testimony also indicated that the defendant in this case had no prior criminal record and had been in no prior difficulty.

It is the duty of a court and jury to resolve all of the facts and circumstances in evidence on the theory of innocence, rather than guilt, if that reasonably may be done, and where the entire record leaves us with a grave and substantial doubt of the guilt of the defendant, we will reverse the judgment; in such case where it does not appear that there are other witnesses available than those who have already testified, the cause will not be remanded for a new trial. (*People* v. *Bradley*, 375 Ill. 182, *People* v. *Jordan*, 4 Ill.2d 155.) "Although the determination of facts, credibility of witnesses and weight of evidence are primarily functions reserved to the jury, it is, in criminal cases, the duty of this court to carefully review the evidence, and if there is not sufficient to remove all reasonable doubt of the defendant's guilt, and create an abiding conviction that he is guilty, the

conviction will be reversed." *People* v. *Urban,* 403 Ill. 420.

It is the rule in criminal cases that this court will examine the record, and if we have a reasonable doubt of the defendant's guilt it is our duty to set aside the conviction. *People* v. *Eatman,* 405 Ill. 491; *People* v. *McGraw,* 13 Ill.2d 249; *People* v. *Coulson,* 13 Ill.2d 290.

"It is the further duty of a reviewing court, where a verdict is returned by a jury in a criminal case, not only to consider the evidence carefully but to reverse the judgment if the evidence is not sufficient to remove all reasonable doubt of the defendant's guilt and to create an abiding conviction that he is guilty of the crime charged." *People* v. *Qualls,* 21 Ill.2d 252; *People* v. *Downen,* 374 Ill. 146.

That a passenger upon a public vehicle or common carrier may not remain thereon without payment of the established fare, and that the employee of the carrier in charge of the vehicle may request the nonpaying passenger to leave and insist that he do so, even to the point of using such force as may be reasonably necessary to accomplish the eviction, is the settled law of this State. (*Kiley* v. *Chicago City Railway Co.* 189 Ill. 384; *Todd* v. *Louisville and Nashville Railroad Co.* 274 Ill. 201, and cases therein cited.) The right to expel a passenger for nonpayment of fare exists independently of statute. Forcible removal under such circumstances is not an unjustifiable assault *per se;* it is only when unreasonable and unnecessary force and violence are used under such circumstances that an assault begins. Actual refusal of a passenger to pay his fare is not necessary to justify his ejection if his conduct is equivalent to a refusal. Illinois Law and Practice, Carriers, sec. 583, and cases there cited.

The guilt or innocence of the defendant is determined by what occurred at the time the decedent left the bus. If the defendant used no more force than was necessary in removing the decedent, no crime was committed. It is the duty of the People to establish their theory of the case by proof

of facts which leave no reasonable doubt of guilt. As to what occurred on the bus, five eyewitnesses testified; of these, three were called by the People. One of these suffered so much difficulty in using the English language that her testimony is of little value; contradictions between the testimony of another at the coroner's inquest and at the trial have been pointed out, and the third eyewitness was called in rebuttal and her testimony was limited to denials of portions of the defendant's testimony and that of witness Vaughn. She, too, experienced some language handicap that resulted in a lack of clarity. The People's eyewitnesses disagree as to what was said by the decedent to the defendant, Barnhill testifying that the decedent said he couldn't pay his fare and wanted a lift, while the two women state the decedent said he had lost his transfer. They also disagree as to whether the defendant asked decedent to pay his fare, Barnhill testifying that he did not, and Mrs. Gniadek testifying that defendant not only asked decedent for his fare at the time he got on the bus, but asked again after defendant had driven across the intersection and stopped the bus in the next block.

While we are loathe to disturb a jury verdict based upon conflicting testimony, we are confronted here with a situation in which the People's theory of the case, while possible, contains some elements of inherent improbability. A fair inference from the testimony is that the decedent had been drinking, and it seems to us a more reasonable hypothesis that the decedent was resisting, to some extent, the effort of the bus driver to escort him from the bus, that the decedent lost his footing on the steps and fell to the sidewalk without any design or intention on the defendant's part that he do so, and that the defendant was exercising no more than the reasonable force he was entitled to exert at the time. Where two equally reasonable hypotheses exist, the law requires the adoption of the one which is consonant with the innocence of the accused.

We are of the opinion that the proof here does not establish the guilt of the defendant beyond a reasonable doubt. Since it does not appear that there would be other witnesses or different evidence available at a second trial, no useful purpose would be served by remanding the cause.

It is therefore the judgment of this court that the judgment of the criminal court of Cook County in this case be and it hereby is reversed, and the defendant discharged.

*Judgment reversed.*