THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* CLIFFORD DARNELL RUSSELL, Defendant-Appellant.

(No. 12390;

Fourth District—June 5, 1975.

CRAVEN, J., dissenting.

John F. McNichols and Thomas Nelson, both of State Appellate Defender's Office, of Springfield, for appellant.

James R. Burgess, Jr., State's Attorney, of Urbana (Robert J. Steigmann and Robert G. Frederick, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE TRAPP delivered the opinion of the court:

Defendant appeals his conviction of murder entered upon a jury's verdict. A sentence of 14 to 30 years was imposed.

Upon appeal, defendant first asserts a denial of right to effective appellate review by reason of the fact that the tape recording of the closing arguments was lost and a transcription was not available to include in the report of proceedings for purposes of review.

In fact it is urged that the omission was not discovered until the record on appeal was filed some 15 months later, and that by such time the record could not be supplemented in the manner provided in Supreme Court Rule 323(c) and 323(d).

■■ The record, however, includes the arguments made at the post-trial motions. The record discloses diligent advocacy both at trial and in lengthy post-trial argument. Examination of such discloses that not one word was directed by defense counsel to the issue of prejudicial argument. The issue asserted was not preserved in the record. See *People v. Hanson*, 53 Ill.2d 79, 289 N.E.2d 611, *cert. denied*, 411 U.S. 937, 36 L.Ed. 2d 398, 93 S.Ct. 1916.

It is argued that defendant was not proven guilty beyond a reasonable doubt. Defendant testified in his own behalf.

The defendant and the victim, Richardson, lived in the home of defendant's father. The shooting occurred shortly after 6 P.M. on January 8, 1972. The testimony shows that the victim and defendant left the home between 9 and 10 P.M. on January 7, and with others went from place to place during the night and arrived at the trailer home of one Monical at about 10 A.M. on January 8. In addition to Monical, others present included Matthew Maggio and Willie Russell (no relation). All remained at this place throughout the day, drinking and talking until sometime before 6 o'clock when defendant was driven to his home by Willie Russell.

The stated purpose was to inquire concerning the condition of defendant's father. Upon defendant's return to the trailer, defendant and the victim went into a small bedroom and immediately six shots were fired in rapid succession. The victim was then observed lying on the floor with his head near the door. Defendant and one witness stated that they saw the revolver lying near the right hand of Richardson.

Defendant's version of the events is that upon his return he entered the trailer, placed his coat in the bedroom, mixed a drink for himself, asked the victim to speak with him in the bedroom, that defendant put his drink down and entered the room to find the victim facing him with the weapon. Defendant stated that he grabbed for the gun and it was fired as they struggled. He had little recollection of how he grabbed the gun or how the struggle progressed. From such version defendant argues that having removed his coat, defendant could not have had the gun concealed in his tight-fitting shirt and trousers and that no witness saw defendant carrying a gun. The version requires the assumption that the victim had been carrying the gun throughout the night before and during the day and left it in his coat in the bedroom.

The only witness testifying to the point contradicts defendant. Willie Russell was sitting in the kitchen at the time of defendant's return. He testified that defendant returned, walked to the door at the first bedroom, leaned against the wall and said something to the victim which caused the latter to curse. Russell states that defendant was then wearing a three-quarters' length coat as he stood in the hall and spoke to the victim. The weapon had a 2-inch barrel. It is readily, if not customarily, thrust under the belt. The jury might properly consider that the argument that defendant's coat had no pockets was of little weight. No witness testified to corroborate defendant's statement that he had removed his coat prior to going into the bedroom.

Defendant's version of the shooting is necessarily weighed in the context of clearly stated physical facts. The uniform testimony is that the shots were heard in rapid, immediate succession. The evidence, including that of the defendant, is that the victim was right-handed. Tests by ballistic experts demonstrated that the trigger pull required to fire the gun in double action was 9 to 13 pounds.

Two bullets entered the body under the right armpit, slightly forward of the medical median line between anterior and posterior. One of such bullets lodged in the spine, one travelled through the heart and lungs to exit on the left side in a downward course, and a third bullet through the victim's right shoulder to emerge through the back. The pathologist testified to the shock and the paralysis that would be caused at least temporarily from each bullet. He testified that while he could not say that it

was impossible, he could not see how the victim could hold the gun in a position to produce the several wounds at the points of entry into his own body.

Defendant testified that as he went into the bedroom, the victim was facing north, allegedly pointing the revolver toward the defendant. The testimony and the photographs admitted into evidence, however, show bullet holes in the southwest corner of the ceiling.

The jury could also consider that while the gun belonged to the defendant and was kept in his room, defendant admitted that following the shooting he concealed the weapon under a pillow in another bedroom and initially denied ownership to the police. He explained that he had not obtained a registration of the weapon.

Tests and measurements of nitrate residue upon the respective hands of the victim and the defendant show a heavier concentration of nitrate in the right hand of the victim than on either hand of defendant. Some nitrate residue was found on each hand of the defendant. Such testimony is to be considered in the light of the evidence that nitrate residue is stable as to a deceased person, but is eroded or worn away by washing the hands, putting the hands in the pockets or rubbing them together. As to the defendant, at least 4 hours intervened between the shooting and the application of the swabs by which the residue was measured. During such time defendant admittedly concealed the gun under the bed clothes in the trailer, as well as time spent waiting at the county jail. Again, such evidence is equally consistent with the victim's grappling for the gun.

It is contended that the victim had access to the gun in defendant's home and was said to enjoy playing with it. We are asked to conclude that he could have been carrying it in his pocket during the period of more than 20 hours. Defendant argues that he did not have an opportunity to obtain the weapon as he did not go upstairs to his room when he stopped at his home to see his father. Scrutiny of the evidence by the jury would disclose factors affecting the credibility of such testimony. When Russell drove defendant to the home, the latter entered by the front door and spent some time talking to his father in the front room. The stairs to defendant's room were at the rear of the hall. The record indicates that defendant left by the rear door of the house to return to the friend's vehicle which was parked in front.

It was argued at the trial and is argued here that the shooting followed a homosexual quarrel. The record, at best, shows a bare suggestion of such relationship and we read defendant's answer to the question as a form of denial. The witnesses, other than defendant, testified to "arguments" and "bickering" between the two during the day, but none were able to state a real impression as to the content.

It is contended that the evidence in this case brings it within the rule of those cases where "evidence is entirely circumstantial it must be inconsistent with every reasonable hypothesis of innocence." To support such argument defendant cites *People v. Johnson*, 317 Ill. 430, 148 N.E. 255; *People v. Lefler*, 38 Ill.2d 216, 230 N.E.2d 827, and *People v. Ibom*, 25 Ill.2d 585, 185 N.E.2d 690, and quotes language which is said to support the position. In neither *Johnson* nor *Lefler* was the court considering evidence, but rather the language was used with reference to instructions. In *Ibom*, such quoted language was stated in dealing with the conflicting and inconsistent testimony of the witnesses for the prosecution.

This is not a case of circumstantial evidence in the sense that defendant's connection with the event is established by circumstantial evidence. It is not denied that defendant was present at the shooting, owned the weapon and was the only person in the immediate vicinity of the victim. The issue is the credibility of the defendant in the light of the evidence of physical facts and the evidence contradicting his testimony. In *People v. Benedik*, 56 Ill.2d 306, 307 N.E.2d 382, there was no prosecution evidence placing defendant at the scene of the killing. Defendant, however, testified to certain circumstances including a claim of self-defense. He contended that such testimony given by him supported a reasonable hypothesis of innocence and that he was not proven guilty beyond a reasonable doubt because the prosecution's evidence did not exclude every other reasonable hypothesis. The court said:

> "The circumstantial evidence against the defendant was substantial. If the jury disbelieved his testimony, as they were entitled to do, they could reasonably have reached the conclusion that the physical evidence, the nature of the wounds on Kresmery's body, the defendant's attempt to hide the bodies and destroy other evidence, his flight and his apparent motive established his guilt beyond a reasonable doubt. It is not necessary that the jury disregard the inferences which naturally flow from this evidence, nor is the trier of fact 'required to search out a series of potential explanations compatible with innocence, and elevate them to the status of a reasonable doubt'." 56 Ill.2d 306, 309.

■■ The evidence was sufficient to establish proof of guilt beyond a reasonable doubt and the judgment of conviction is affirmed.

Affirmed.

SIMKINS, P. J., concurs.

Mr. JUSTICE CRAVEN, dissenting:

I cannot agree with the majority that the evidence in this case was sufficient to establish the crime of murder and the defendant's guilt beyond a reasonable doubt.

Defendant and the decedent, Vernon Richardson, were roommates who had been out with friends the evening and early morning hours of January 7-8, 1972. The socializing continued throughout the day of January 8 at a friend's mobile home. Others present agreed that decedent and defendant had been bickering off and on throughout the day, though Russell testified that the "bickering" was nothing more than a repeated attempt on his part to convince Richardson to come home to get some sleep. Russell left the trailer briefly, returned, and indicated that he would like to speak with Richardson. Richardson responded angrily and both went into the bedroom. Russell testified that Richardson preceded him into the bedroom; there was no other testimony as to who entered first.

Moments later, six shots in rapid succession were heard. When the first observer entered the room and turned on the light seconds after the shooting, Richardson lay on the floor on his side with his head near the door and his feet near the back wall of the bedroom. There was a gun within an inch or two of Richardson's hand. The defendant Russell stood in the doorway facing into the room. Russell claimed at that time, and has continued to maintain, that it was Richardson who had the gun and fired the shots. Russell said at trial that when he entered the room, Richardson stood facing the door, pointing a gun at him. Russell's first impulse was to go for the gun, which was in Richardson's right hand. The gun began discharging, they struggled, and the next thing Russell remembers with any clarity is standing in the doorway with Richardson at his feet.

The gun which killed Richardson belonged to Russell and was not registered. Immediately after the shooting, Russell hid the gun in another bedroom. He produced the gun on request when the police arrived at the trailer a few minutes later, but denied its ownership. He testified that his hiding of the gun was an effort to preserve it for the police and that his refusal to acknowledge ownership arose out of his realization that the gun was not properly registered. No one in the trailer had seen a gun prior to the shooting.

Richardson was living with Russell and had equal access to Russell's bedroom, where the gun was kept beneath the mattress. Richardson had not been in their apartment for almost 24 hours prior to the shooting, but he had with him throughout that period a heavy coat with pockets which were ample to accommodate the gun. Though Richardson was dressed, as the State notes in its brief, in tight-fitting clothes that would not conceal a gun, there is indirect evidence to indicate that his coat was

probably in the bedroom when Richardson entered it just prior to the shooting.

Russell claimed that until the shooting he had not seen the gun for several days. Russell himself had with him only a light coat with no bottoms in the pockets, and could not have been carrying the gun undetected since the night before. However, he admits to having visited his residence during his brief absence just before the shooting. Russell testified that on his return to the trailer he first put his coat in the bedroom, then asked decedent to speak with him. The majority notes that Willie Russell's testimony on this point was rather that defendant Russell kept his coat on until he and decedent entered the bedroom. For purposes of establishing access to the gun, the conflict is insignificant. If as the State contends, defendant entered the bedroom ahead of Richardson, he could have retrieved the gun from his coat in any case.

There is convincing evidence that Richardson fired a gun before his death. Cotton swab tests showed a significantly greater concentration of antimony and barium on his hands, especially on his right hand, than on the hands of anyone else in the mobile home. While the State's expert testified that measurable quantities of these elements can be picked up by one merely in the proximity of a discharging gun, he also said that Richardson's right hand had residue "typical of and consistent with the residues we find after the discharge of a firearm." In addition, the gun was seen within an inch or two of Richardson's hand where he lay on the floor just seconds after the shooting, at a time when Russell could hardly have had time to place it anywhere and was exhibiting signs of shock inconsistent with such forethought.

Others in the mobile home just prior to the shooting testified that Richardson was visibly agitated during Russell's brief absence from the trailer before the shooting. He claimed Russell had left the trailer to go destroy his [Richardson's] clothes. Medical testimony based on a blood alcohol reading showed that Richardson was intoxicated at the time of his death.

Russell's hands were not tested for firearm residue until several hours after the shooting. At that time, they showed higher concentrations of antimony and barium than were found on the hands of those who were not in the room during the shooting, but concentrations not consistent with the discharge of a firearm. In addition, Russell had about equal concentrations of antimony and barium *on each hand,* and a powder burn on one hand, facts which support his claim of "going for the gun" rather than the State's claim that he held and fired it. During oral argument before this court, the State stressed that firearm residues can be wiped or

washed off the hands and claimed that Russell had borrowed a handkerchief from another witness and wiped his hands in the trailer before police arrived. The record does not bear out this contention. That witness' testimony was that Russell displayed the powder burn and asked if anyone had a handkerchief while they were at the police station awaiting questioning, not before police arrived at the trailer. Moreover, the witness went on to say that no one gave Russell a handkerchief. There is no testimony in the record to indicate whether he had any opportunity to clean or wipe his hands before the testing for firearm residues.

The State stresses Russell's visit to his residence just prior to the shooting as heavily incriminating. The implication is that he went home, picked up the gun, and returned to the trailer to shoot Richardson. Russell's explanation, that he went home to check on his invalid father and did not even go to his bedroom while in the house, was corroborated at trial by the father's testimony. The majority says "the record indicates that the defendant left by the rear door of the house [which was close to the stairs of defendant's bedroom] to return to the friend's vehicle which was parked in front." I find nothing in the record to support this statement. Bob James, the friend who drove defendant to his home, did not testify. Defendant was not asked whether he left by the front or back door or where the car was parked. Defendant's father testified that his son both entered and left through the front door. Thus, there is no evidence in the record contradicting defendant's claim that he did not go to his bedroom while he was at home just before the shooting.

The strongest evidence against Russell's version of the shooting is the nature and location of Richardson's wounds. Two shots entered through the right side below the armpit, and one through the right shoulder. Two other shots went into the ceiling and one into the door about a foot from the floor. The State relied heavily in its brief and at oral argument before this court on the pathologist's testimony that Richardson's wounds were very unlikely to have been self-inflicted. The defense contended that the medical testimony did not establish the wounds could not have been self-inflicted. The following represents the entire medical testimony on that point:

"Q. Now Doctor, based on the amount of damage done to Mr. Vernon Richardson and based on your observation of the bullets do you have an opinion Sir as to whether or not those could be self-inflicted?

A. I don't see how.

\* \* \*

Q. Now let me ask you this. Are you saying to a reasonable degree of medical certainty that these wounds could not have been,

uh—the phrase that was used self-inflicted. Uh, what do you mean or take to mean by that phrase?

A. Suicide.

Q. You take it to mean that, uh—you use the word suicide as an intentional act on the part of an individual to kill himself?

A. Yes.

Q. Now do you, in medical terminology or degree of medical certainty relate suicide to the same accuracy as to the—the actual physical act as to whether the person wounded must have performed the wounding? Does that mean the same thing to you, if my question is clear?

A. No it doesn't.

Q. There would be a difference?

A. Yes.

Q. In other words, uh, you're not telling this jury that it would have been physically impossible for Vernon Richardson to have been the person who pulled the, uh, trigger or fired the firearm which inflicted the wounds you've described?

A. No I'm not."

Though the angle is an unnatural one, I cannot call Russell's version of the shooting incredible on the basis of the wounds. Assuming, as Russell testified, that Richardson had the gun, that Russell grabbed for it with both hands and attempted to direct it away from himself, that throughout this period Richardson continued to fire the weapon, it is neither impossible nor unreasonable to believe that the gun may have gone off at angles far from what one would expect under normal circumstances.

Nor can this court say, as the State suggests in its brief, that the amount of pressure needed to fire the gun makes Russell's story incredible. A firearms expert testified that it would take from 9 to 13 pounds of pressure to fire the gun doubleaction (that is, without cocking it between shots), as the rapidity with which the shots went off indicates the gun was fired. The State's hypothesis, as set out in its brief, is that Russell entered the room, pulled the gun, and began firing at Richardson as he entered. However, the pathologist testified that all three of Richardson's wounds were sustained at very close range. He described the one in the shoulder as having been fired 6 to 8 inches from the contact point and those on the side as from 1½ to 2 inches away. Another of the State's witnesses said he heard sounds of a struggle *before* the shots, a fact which also undercuts the State's suggestion that Russell surprised Richardson by firing at him.

It is the duty of a reviewing court to review the evidence, and if it is not sufficient to remove all reasonable doubt of the defendant's guilt and create an abiding conviction that he is guilty, to reverse. (*People v. Doug-*

*ard*, 16 Ill.2d 603, 158 N.E.2d 596.) In a case where the evidence is entirely circumstantial, this court must be convinced that the facts proved are not only consistent with defendant's guilt, but inconsistent with any reasonable hyothesis of innocence. (*People v. Branion*, 47 Ill.2d 70, 265 N.E.2d 1.) Here, all the direct evidence is entirely consistent with Russell's version, so that this court must decide whether the circumstantial evidence is "inconsistent with any reasonable hypothesis of innocence."

Such an approach is supported by a long line of Illinois cases dating back to *People v. Johnson*, 317 Ill. 430, 438, 148 N.E. 255, where the court said:

> "If the evidence is capable of a reasonable explanation consistent with the innocence of the defendant there can be no theory on which a verdict of guilty can be based, because if the evidence is consistent with innocence it cannot be said that guilt is proved beyond a reasonable doubt."

In *People v. Ibom*, 25 Ill.2d 585, 185 N.E.2d 690, the court applied this principle to a case where an eyewitness claimed to have seen a bus driver push decedent off his bus, thereby causing a fatal injury. Defendant and one other witness had a different version of the incident. The court, noting contradictions in the testimony of the State's witnesses, the reasonableness of the defendant's own version of the incident, and the fact that decedent was apparently drunk, said the State's version had "elements of inherent improbability" and reversed on the principle that: "Where two equally reasonable hypotheses exist, the law requires the adoption of the one which is consonant with the innocence of the accused." 25 Ill.2d 585, 594.

In *People v. Lefler*, 38 Ill.2d 216, 230 N.E.2d 827, defendant was charged with the murder of his infant daughter. Part of defendant's argument was that any mistreatment of his daughter might have been as much the result of his mistaken notion of how to handle a baby safely as it was of criminal intent to harm the child. The question was raised in connection with instructions, and the court said that the correct legal principle was that "if his conduct could from the evidence be referred to one of two intentions, one criminal and one innocent, it was the duty of the jury to presume that such conduct was actuated by innocent intent. Such an instruction is proper where opposing theories as to guilt or innocence arise out of the same facts * * *." (38 Ill.2d 216, 222.) While it is not necessarily the defendant's state of mind that is in contention in the instant case, the principle that innocence must be presumed where opposing theories arise out of the same set of facts is applicable.

In *People v. Lewellen*, 43 Ill.2d 74, 250 N.E.2d 651, the 63-year-old defendant was picked up in Chicago with the body of her 73-year-old hus-

band in the car. The husband had died of shock and loss of blood from some superficial wounds. Defendant gave, in all, four different accounts of circumstances leading up to the scene in Chicago and her reasons for moving the body from Quincy to Chicago. Her final story was that she injured her husband in self-defense when he began beating and choking her. The court, while noting that it was by no means sure that defendant's final version of the story was true, said that any other theory of what happened would be sheer conjecture. "If her testimony is disregarded there is little left but conjecture to establish that death was caused by criminal conduct on her part. Where the only evidence in a prosecution for homicide is circumstantial evidence the guilt of the accused must be so thoroughly established as to exclude every other reasonable hypothesis." 43 Ill.2d 74, 78.

In the instant case, as in *Lewellen*, if we do not accept the defendant's version of the incident, we are left only with conjecture to determine whether defendant acted solely on his own impuse, in self-defense, or in some sudden burst of emotion brought on by being confronted with a gun in decedent's hand. The court in *Lewellen* went on to say: "Where, as here, there exists a reasonable doubt as to whether the accused is guilty of manslaughter or murder, or is not guilty because in the exercise of self-defense, the doubt should be resolved in favor of the accused." 43 Ill.2d 74, 78.

In *People v. Striker*, 3 Ill.App.3d 464, 274 N.E.2d 881, where some incriminating evidence linked defendant to the scene of a hit-and-run accident but he had a reasonable explanation for his activities and the incriminating circumstances, the court said that where some of the evidence was consistent with guilt, yet not inconsistent beyond a reasonable doubt with innocence, defendant should not have been found guilty.

The State in its brief cites *People v. Swank*, 20 Ill.App.3d 1079, 314 N.E.2d 32, and *People v. Benedik*, 56 Ill.2d 306, 307 N.E.2d 382, as cases where a jury's decision based on weaker evidence than in this case was upheld. In both *Swank* and *Benedik*, there were circumstances more incriminating than those in the present case. In *Swank*, the defendant was accused of murder and burglary. The State's case included display of stolen property recovered from the automobile used by defendant shortly after the crime, incriminating admissions made by defendant shortly after the crime, and a *signed written confession*. In response, defendant produced alibi witnesses who placed him at a location other than that of the crimes at the time when the crimes must have been committed. That is, the State and the defendant offered evidence in support of essentially different versions of the facts. The court said the presumption in favor of an innocent interpretation does not apply where the parties are alleging

completely different sets of facts, and that jurors are not required to believe defendant's alibi witnesses simply because they are offered. In *Benedik*, defendant's ex-girlfriend and the man for whom she left him were found murdered some hours after defendant had been seen following the two out of a bar. Blood matching that of the victim was found in the defendant's car trunk; there was also evidence he had tried to destroy the rug matting and insulation from the trunk. His tire tracks were found near the girl's body. In response to the State's case, defendant gave a complicated story involving finding the girl dead after a fight with her new boyfriend. The court in that case said that simply because defendant was able to offer a version consistent with innocence did not in itself elevate that version to the level of reasonable doubt. Russell's version of his encounter with Richardson in the present case is in no way comparable to the rather outlandish story told by Benedik in his defense.

It would, as the State said, be unfair to acquit in every case where two people enter a room together and only one emerges alive. There is substantial evidence that this case is not simply a murder with no witnesses. The firearms residue on Richardson's right hand only, the location of the gun within inches of his hand seconds after the shooting, the repeated testimony that Richardson was extremely agitated and upset, the evidence that he was drunk at the time of the shooting, and the fact that both Richardson and Russell in this case had access to the death weapon, all served to differentiate this case from the rather general hypothetical in which two people enter a room and only one emerges alive.

While the jurors might even have reasonably concluded that it was more likely than not that Russell murdered his friend, that is not the standard of guilt in a criminal case. On review of the entire record, I cannot say that the State's evidence was sufficient to prove Russell guilty beyond a reasonable doubt.