THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* RONALD WITHERSPOON, Defendant-Appellant.

(No. 60502;

First District (1st Division)—October 6, 1975.

*Rehearing denied November 4, 1975.*

14

Paul Bradley and Laurence A. Benner, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon and John T. Theis, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE GOLDBERG delivered the opinion of the court:

After a jury trial, Ronald Witherspoon (defendant) was found guilty of rape (Ill. Rev. Stat. 1971, ch. 38, par. 11—1) and was sentenced to 5 to 15 years. He has appealed.

In this court defendant urges that identification testimony was improperly received; the evidence was not sufficient to prove guilt beyond a reasonable doubt; prejudicial trial error resulted from improper cross-examination of defendant and improper final argument by the prosecutor; and that the sentence was excessive. The position of the State is that the identification testimony was properly received as defendant was arrested after hot pursuit by police officers and the identification had an independent origin and basis; the evidence was ample to prove guilt beyond a reasonable doubt; objections to the allegedly prejudicial cross-examination were duly made and sustained and the jury was instructed by the court to disregard the same; the allegedly prejudicial final argument was proper comment and was not a material factor in the verdict and the sentence was not excessive.

A summary of the testimony is required. The complaining witness testified that about 8:30 p.m. in the evening on March 19, 1973, she was on her way home from visiting a friend. As she left the elevated train it commenced to get dark. She stopped in a tavern on the south side of Chicago to see if she could find someone to walk home with her.

She met a friend named George Childs. After 10 or 15 minutes they left together and walked down Cottage Grove Avenue to 63rd Street then east to Ingleside Avenue where they turned north. They were suddenly surrounded by four men. Two of them demanded money from Mr. Childs. The remaining two accosted the witness. She identified defendant in court as one of these men and stated that he was dressed in a black coat and blue jeans and was wearing a sweater. The defendant repeatedly demanded money from her. She responded that she had none. Defendant searched through her purse and coat. He then said that he would "do the next best thing." When she tried to resist the defendant struck her in the eye and told her to be quiet.

The complaining witness testified that there was "normal" lighting on Ingleside where she was first accosted. There were no lights out. Prior to entering the gangway she was able to see the defendant's face since he was facing her and she was inches away from him during the conversation regarding money and the search of her purse and coat.

Both of the men then took her across the street to a passageway, or gangway, between two buildings. The other man went toward the back of the gangway closer to the alley and to Ellis Avenue which is the next street east of Ingleside. The complainant testified that defendant then raped her. During this process he loosened his trousers and dropped them to his knees.

The complaining witness then heard a noise and defendant's companion said he thought the police were coming. She then saw a flashlight beam shining down the gangway and heard steps. Defendant got up and started to pull up his trousers and to run away. The witness screamed and told the police that she had been raped and her assailant was running down the alley. One police officer stayed with her and another gave pursuit. The officer took the complaining witness to a squad car. When the police brought defendant past this car, while taking him to a squadrol, she told them that he was the man who had attacked her. That night, or during the early morning thereafter, the police showed her photographs of possible suspects including the defendant. Her vision was "blurred" and she failed to identify any one of them because she could not see as clearly as usual. The parties stipulated that a medical examination of the witness made at the hospital was negative for the presence of sperm.

Police Officer Crossley testified that he spoke briefly to Childs, who had accompanied the complaining witness, and then shined his light into the gangway. He saw a man dressed in a black coat and blue jeans on top of a woman. He chased the man who pulled up his pants and ran east and then down the alley. The officer pursued this person until

he climbed in through a window at the rear of an abandoned, partly burned, building fronting on Ellis Avenue. A number of officers had accompanied Mr. Crossley. One of them went to the north side of the abandoned property and the other to the south. Another, Officer Greene, drove around to the front on Ellis Avenue. In a few moments Officer Greene brought an arrestee around to the back of the abandoned building. He was wearing a blue coat and blue jeans and matched the description of the man that officer Crossley had just seen on top of the victim. Officer Greene made an in-court identification of defendant as being the man he had thus arrested. Officer Crossley also testified that he took defendant back to Ingleside Avenue to put him into a squadrol. As they walked past the car in which the complaining witness was sitting, she stated, "That's the man that raped me."

Officer Greene testified that he saw a man running from the rear of the building at 6217 Ingleside Avenue. He saw this man enter the abandoned building through a rear window with other officers in pursuit on foot. He then drove his squad car around to the front of the building on the west side of Ellis Avenue. He saw the defendant, wearing a black three-quarter length coat and blue jeans, leaving the front entrance of the building. Defendant's trousers were unbuckled and unzipped. The officer then took the defendant into custody.

The parties stipulated that a police investigator would testify that he attempted to contact Childs without success. He determined that Childs had left Chicago for New York and had no forwarding address. It was also stipulated that defendant was 18 years of age and the complaining witness 42.

For the defense, defendant's mother testified that on the evening in question the defendant was home with her. She asked him to go to a nearby liquor store on 63rd Street and Ingleside Avenue to buy her a package of cigarettes. When defendant left she stood on the front porch of her third floor apartment from which she could watch him as he went on this errand and returned. She saw him walking south on Ellis Avenue to 63rd Street where he turned west to walk to the store at Ingleside. She lost sight of him after he had turned the corner. She continued to watch and saw him returning, walking north on Ellis Avenue, until he was directly in front of their home. This took about 30 minutes. She then saw a police car come up and her son arrested. She went down and spoke to the police. One of them told her that there was a robbery. When she remonstrated, the officer said, "Lady, we got to get somebody." She did not know the name of this officer but believed that she could identify him. Ellis Avenue was well lit and the lighting conditions there were "beautiful."

Defendant's mother also testified that the doors and windows of the abandoned building on Ellis Avenue had been boarded up and the building was since demolished. The defendant had broken his leg three times on various occasions. The third time he had a cast placed on the leg which he removed himself about February 14 or 15. He could not run on that leg at all because it would swell if he walked or ran on it. She never observed her son in the alley and he was not near the vacant and abandoned building. The day after the incident, she observed the complaining witness and saw nothing unusual about her eyes. She thinks that her son wore blue jeans on the night in question but was not sure about the type of coat.

Defendant's aunt testified that he enjoyed a good reputation for honesty, morality and obedience to the law. She remembered his difficulty with one leg but was not sure which one. Once he was riding a minibike and fell and broke his leg. He broke the leg again later when he fell off a garage. The third time his leg was broken when he was playing ball. He had casts on all three times. The last cast went up to his hip and he took it off himself about the 15th of March, 1973. She saw the defendant just about every day. A day or two after the cast was removed, he could hardly walk and he limped a little. He was not able to run. She observed the complaining witness on March 20, 1973, and saw nothing unusual about either one of her eyes.

Defendant testified that he walked home from the store on the night in question on the east side of Ellis Avenue and that he was nowhere near the abandoned building which was on the west side. He did not run on the way home. His right leg was first broken in 1965, then again in 1970. The third such injury occurred when he was playing ball. He took the cast off by himself about February 15. He could play ball but did not and could not run while he was playing. After he took the cast off in February, he did not go back to see the doctor. He did not know the exact day of the accident but recalled that he spent a week in Cook County Hospital at that time.

On the date in question, his leg was swollen and he was unable to run on it. That night he wore a rather short navy blue coat and blue pants, not blue jeans. When he was outside of his home that night, he did not at any time unbutton or unzip or partially remove his clothing.

The abandoned building was boarded up so that no one could walk through. At the time of his arrest, he made no statement to Officer Greene. He was "absolutely positive" of this. The errand to the liquor store, or tavern, took him about 30 minutes because there were about 10 people in front of him in line.

In rebuttal, the State called Officer Greene who testified that he saw

the man he later arrested in his spotlight. The man was running. The building on Ellis Avenue was boarded up and he saw the defendant exit from the building by the front door. When he first observed defendant, the latter's trousers were unzipped and unbuckled. After the arrest, the defendant told him that he had entered the abandoned building to relieve himself.

■■ The first issue raised by defendant is improper identification. Defendant filed a motion to suppress identification testimony of any witness in the cause, alleging that the police directly caused the identification witness to point him out and that he was not advised of his right to have counsel at the time of the confrontation. The court heard this motion to suppress prior to trial and overruled it. Defendant himself was the only witness at this hearing. He testified that he was never pointed out by any person as the guilty party and that he was never in a lineup. Photographs were taken of him when he was in the station but he never saw them. Defendant offered no evidence tending to prove that his identification, while he was in police custody, was prearranged or suggestive. The burden rested upon defendant to prove that the police procedure at the time of this identification was impermissibly suggestive and thus conducive to mistaken identification. (*People v. Brown*, 52 Ill.2d 94, 100, 285 N.E.2d 1.) We reject the contentions of error advanced by defendant in this regard.

It has been repeatedly held that an in-court identification of an accused without a previous lineup does not deny a defendant due process of law. (*People ex rel. Blassick v. Callahan*, 50 Ill.2d 330, 334, 335, 279 N.E.2d 1.) Thus, although it is true that defendant was never viewed in a conventional type lineup, there was no legal reason requiring the police officers to do this. It is difficult to classify the identification occurrence as a confrontation. The complaining witness was seated in a police car prior to being taken to the station. The defendant was being escorted to a squadrol for the same reason. There is no evidence that this was intentionally done by the police for identification purposes. On the contrary, so far as this record shows, the view which complaining witness then had of the defendant immediately after his arrest, was entirely unstaged and occurred by mere chance. The complaining witness then spontaneously stated that defendant was the man who had attacked her. See *People v. Canale*, 52 Ill.2d 107, 112, 113, 285 N.E.2d 133.

●■ Even if this so-called confrontation had been suggestive, the strong identification of defendant by the complaining witness in court was proper because it was based upon sufficient uninfluenced prior observation of defendant. (*People v. Connolly*, 55 Ill.2d 421, 427, 303 N.E.2d

409; *People v. Stringer*, 52 Ill.2d 564, 568, 289 N.E.2d 631.) In the case before us, the complaining witness had an ample opportunity to observe defendant in a well-lighted area. Defendant's mother testified that the street lighting on the next block was "beautiful." The complaining witness testified that the lighting on the street was normal and none of the lights were out. She had an excellent opportunity for close observation of defendant when he repeatedly demanded money from her, when he searched her purse and then her coat in her presence. According to her testimony, she conversed with him during this time. She had opportunity for additional observation when defendant was forcefully taking her across the street and approaching the gangway. Although it would appear that the gangway was not as well lighted as the street, defendant would necessarily be inches away from the complaining witness while raping her. The identification of defendant is further strongly supported by the clear testimony of the police officers. One of them saw defendant in the very act of raping the complaining witness, chased him and saw him enter the rear of the abandoned building. He identified defendant as being this same person who was then arrested by another officer. The other officer saw defendant enter the abandoned building and then saw him leave from the front entrance immediately before he arrested him. The police officers took up positions on all sides of the building so that it was manifest that the man who entered at the rear was in fact the one who left through the front and was arrested.

■■ Defendant also urges that in the police station, after the incident, the police showed the complaining witness a number of photographs, including his, and that she was unable to identify any of them. The complaining witness testified that her eyesight was blurred when she viewed the photographs because of a blow from defendant. The defense evidence is that there were no visible marks on her face. In any event, this evidence goes merely to the weight of the identification testimony which was an issue of fact to be determined by the jury. *In re Williams*, 24 Ill. App.3d 593, 596, 321 N.E.2d 281.

■■ Defendant also urges that there were discrepancies in the testimony of the complainant because she described him only by his clothes and on one occasion she testified that he wore blue jeans and on the other, dark blue pants. The credibility of an identification does not rest upon the type of facial description or other physical features which the complaining witness is able to relate. (*People v. McCall*, 29 Ill.2d 292, 295, 194 N.E.2d 222.) It depends rather upon whether the witness had a full and adequate opportunity to observe the defendant. (See *People v. Catlett*, 48 Ill.2d 56, 63, 268 N.E.2d 378, and *People v. Brown*, 14 Ill. App.3d 242, 245, 302 N.E.2d 161.) A mere discrepancy in description, or

an omission to note facial or other physical features, is not by itself sufficient to create a reasonable doubt of guilt. Positive identification by a credible and unimpeached witness, as in the case before us, is sufficient to convict even though the testimony is contradicted by the accused. *People v. Stringer*, 52 Ill.2d 564, 569, 289 N.E.2d 631, and cases there cited. ██ Furthermore, this case presents a proper situation for an on-the-spot identification. Defendant was literally caught in the act and was arrested after hot pursuit. Many potent factors approve an immediate effort by the police to present the suspect to the victim for purposes of identification. This situation is fully considered and the pertinent authorities are cited in *People v. Bey*, 51 Ill.2d 262, 265, 281 N.E.2d 638, and *People v. Elam*, 50 Ill.2d 214, 217, 218, 219, 278 N.E.2d 76.

These thoughts are material in consideration of defendant's argument regarding insufficiency of the proof. In our opinion, we have here directly conflicting evidence which presented simply an issue of credibility for determination by the jury. We have noted that the identification of the defendant is positive and unshaken. This testimony was strongly corroborated by the police. As against that, we have the testimony of defendant, his mother and his aunt. This testimony does not constitute an alibi in the proper sense but is more in the nature of a direct contradiction of the testimony of the complaining witness and the police officers.

In characterizing this situation, two factors are important. First, if the defense testimony is to be accepted, this requires complete negation of all of the testimony of the prosecution and also requires the trier of fact to believe that the police officers and the complaining witness, apparently complete strangers each to the other, entered into a spontaneous conspiracy to procure the arrest and conviction of a totally innocent person. A search of the entire record shows no motive for this type of conduct and no suggestion of any reason to believe that it actually existed. It is true that by and large the defense witnesses corroborated each other. However, all of their testimony is without support from any unbiased source. Truly it must be admitted that defendant and the two witnesses were all interested in the outcome of the trial to a greater extent than the police officers. In this important particular, the case before us is far different from *People v. Gardner*, 35 Ill.2d 564, 221 N.E.2d 232, cited and relied upon by defendant. In *Gardner*, the identification testimony was weak and doubtful. The defendant's alibi was strongly corroborated by an unimpeachable source; the testimony of the proprietor of the movie house in identifying the ticket stub in defendant's possession.

The jury did not accept the defense evidence as creating a reasonable doubt. It was "within the province of the jury to judge the credibility

of witnesses, weigh the testimony and determine matters of fact. The determination of the jury will not be disturbed unless the evidence is so unsatisfactory as to justify a reasonable doubt of guilt." (*People v. Benedik*, 56 Ill.2d 306, 310, 307 N.E.2d 382.) The conclusion that we may not disturb the finding of the jury under circumstances of this type has been described by the Supreme Court as "axiomatic." *People v. Glover*, 49 Ill. 2d 78, 84, 273 N.E.2d 367.

Defendant's final point is concerned with alleged trial errors. On cross-examination of the defendant, the following occurred:

"PROSECUTOR: Q: Isn't it a fact, Mr. Witherspoon, that you support yourself by robbing people?

DEFENSE COUNSEL: Objection, your Honor, this is highly prejudicial.

THE COURT: Sustained, strike it out.

PROSECUTOR: And when you can't rob them you rape them?

DEFENSE COUNSEL: Objection.

THE COURT: Sustained, strike it out."

In his final argument, the same Assistant State's Attorney, Anthony M. Montemurro, made these statements to the jury:

"That is what he [the accused] is, a crumb; somebody who goes in the darkness of night and take [*sic*] what he wants for his own sexual gratification.

The question should have been asked [of defense witness] 'What do you think his reputation in the community is for forcibly raping an innocent woman.'

If you want to let [the accused] go home, take him home with you. I don't want him in my neighborhood at night. Take him home with you.

He [the accused] is a liar and a rapist * * *. That man is guilty as the day is long. Find him guilty."

None of these alleged errors are noted in defendant's written motion for new trial. This motion set forth in a general way that defendant did not receive a fair trial and it prayed a new trial upon "such other grounds and each and every error as may appear from the reporting of the proceedings, the half-sheet, etc." In our opinion, failure to specify these alleged errors in a motion for new trial constituted a waiver of these issues and they cannot be urged as a ground for reversal on review. This general rule of waiver has even been applied to constitutional questions. (See *People v. Pickett*, 54 Ill.2d 280, 282, 296 N.E.2d 856, and cases therein cited; *People v. Hairston*, 46 Ill.2d 348, 367, 263 N.E.2d 840, *cert. denied*, 402 U.S. 972.) Also, as we will demonstrate, we believe that all of these

points should be classified as harmless rather than as plain error. (Sup. Ct. R. 615(a), Ill. Rev. Stat. 1973, ch. 110A, par. 615(a).) See *People v. Howell*, 60 Ill.2d 117, 120, 121, 324 N.E.2d 403.

As regards the allegedly prejudicial final argument, no objection was made by defendant to any of the statements by the prosecutor above noted. Therefore, we have another reason for invoking the general rule of waiver. Counsel for defendant did avail himself of his right to object during the course of final argument by the prosecution, but, he did not raise any objection to any of the statements above noted. It is true, as counsel for defendant points out, that in certain cases reviewing courts of Illinois have considered prejudicial final argument in the absence of an objection. This is particularly true in the older cases. (*People v. Kirkendoll*, 415 Ill. 404, 114 N.E.2d 459; *People v. Moore*, 9 Ill.2d 224, 137 N.E.2d 246; *People v. Fort*, 14 Ill.2d 491, 153 N.E.2d 26.) However, more recent cases have repeatedly held that allegedly prejudicial argument will not be considered in the absence of an objection. (*People v. Edwards*, 55 Ill.2d 25, 35, 302 N.E.2d 306, *cert. denied*, 415 U.S. 928; *People v. Smothers*, 55 Ill.2d 172, 176, 302 N.E.2d 324. Also *People v. Russell*, 29 Ill.App.3d 59, 60, 329 N.E.2d 450, *citing People v. Hanson*, 53 Ill.2d 79, 289 N.E.2d 611, *cert. denied*, 411 U.S. 937.) Perhaps the correct rule is that the effect of allegedly prejudicial argument is waived in the absence of objection except where the court was able to say that "the improper remarks were so prejudicial that defendant did not receive a fair trial or were so flagrant as to threaten deterioration of the judicial process." *Smothers*, 55 Ill.2d 172, 176, citing *Moore*, 9 Ill.2d 224, 232.

██ Scrutinizing the argument complained of, the characterization of defendant as a "crumb" is not the finest English usage. However, according to the testimony of the complaining witness, the defendant did earn an opprobrious description. Regarding the expression of opinion that defendant was a liar and a rapist and guilty as the day is long, the same conclusion appears. Expression of an opinion of guilt by the prosecutor is proper if it is based upon the record. (*People v. Prim*, 53 Ill.2d 62, 77, 289 N.E.2d 601; *People v. Eastland*, 11 Ill.App.3d 271, 296 N.E.2d 363.) The remaining remarks by the prosecutor can hardly be classified as exemplary or proper argument but we do not believe that they can be characterized as being so flagrant as to threaten deterioration of the judicial process. Even if objection had been made, we cannot say that these instances were actually a "material factor" in defendant's conviction (*People v. Clark*, 52 Ill.2d 374, 390, 288 N.E.2d 363) or that the assailed arguments not justified by the evidence resulted in "substantial prejudice to the accused." *People v. Nilsson*, 44 Ill.2d 244, 248, 255 N.E.2d 432, *cert. denied*, 398 U.S. 954.

██ As regards the offensive questions put by Mr. Montemurro to the

defendant on cross-examination, both of them were entirely improper and uncalled for. Putting this type of question not once but twice may require censure of the offending attorney by a tribunal other than this court. However, in both instances alert defense counsel made his objections which were properly sustained by the trial court with the admonition that the offensive questions be stricken. The jury was instructed by the trial court to disregard this type of question and to determine the facts only from the evidence in the case. (IPI—Criminal, No. 1.01.) The prosecution evidence was strong and convincing beyond reasonable doubt. We cannot believe that this incident was a material factor in the verdict. No motion for mistrial was made by defendant and this alleged error was not specified in defendant's motion for new trial. In our opinion, no reason for reversal of the judgment appears from these alleged errors, even entirely aside from the grounds for waiver above pointed out.

■■ Defendant's final contention is that the sentence of 5 to 15 years is excessive. Defendant complains that the Assistant State's Attorney told the court in aggravation that defendant had been arrested once before. We condemn such a statement by the State's Attorney since evidence of arrests is not admissible at the hearing in aggravation and mitigation. (*People v. Price*, 7 Ill.App.3d 110, 117, 286 N.E.2d 530, *appeal denied*, 52 Ill.2d 599, and cases there cited.) However, the sentence was not influenced by this statement. It appears from the record that the trial court was well aware of the fact that defendant had no prior conviction of record against him and that he was 18 years old at the time of the offense.

■■ This court has power to reduce the punishment imposed by the trial court. (Ill. Rev. Stat. 1973, ch. 110A, par. 615(b)(4).) But, it has been strongly established in many cases that the trial court is normally in a better position to make a sound determination as to punishment than are courts of review (*People v. Hampton*, 44 Ill.2d 41, 48, 253 N.E.2d 385) and that no reviewing court should disturb a sentence "unless it clearly appears that the penalty constitutes a great departure from the fundamental law and its spirit and purpose, or that the penalty is manifestly in excess * * *" of constitutional proscription. (*People v. Taylor*, 33 Ill.2d 417, 424, 211 N.E.2d 673, cited in *People v. Sprinkle*, 56 Ill.2d 257, 264, 307 N.E.2d 161, *cert. denied*, 417 U.S. 935.) Upon consideration of these principles we have concluded that we should not disturb the sentence in the case at bar.

The judgment appealed from is accordingly affirmed.

Judgment affirmed.

BURKE, P. J., and EGAN, J., concur.