(No. 15166.—Reversed and remanded.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, vs. FRANK DURAND, Plaintiff in Error.

*Opinion filed April 18, 1923.*

1. CRIMINAL LAW—*burden of proof never shifts to defendant— self-defense.* The burden of proof in a criminal case never shifts to the defendant no matter what his defense may be, and it is sufficient to acquit the defendant if evidence of self-defense, together with all the other evidence in the case, creates in the minds of the jury a reasonable doubt of guilt.

2. SAME—*section 155 of Criminal Code should not be given as an instruction in homicide case.* Section 155 of the Criminal Code, providing that where the killing is proved the defendant is required to prove circumstances of justification or mitigation, is merely an abstract proposition of law and should not be given as an instruction in any homicide case.

3. SAME—*when sections 148 and 149 of Criminal Code should not be embodied in an instruction.* Sections 148 and 149 of the Criminal Code, as to what constitutes justifiable homicide, should not be embodied in an instruction in a homicide case where the only defense is self-defense and there is no question as to defense of habitation or as to other matters mentioned in such sections.

4. SAME—*the common law doctrine as to what constitutes self-defense is no longer in force.* The doctrine of the common law that one must have exhausted every effort to escape before he can avail himself of the right of self-defense is no longer in force, but the law is that if a person, while he is in a place where he has a lawful right to be, is unlawfully assaulted and put in apparent danger of his life or great bodily harm, he need not attempt to escape but may lawfully stand his ground and meet force with force, even to the taking of his assailant's life, if necessary.

5. SAME—*instruction as to malice, ignoring self-defense, is erroneous.* In a murder trial, where the only defense is self-defense, it is error to give an instruction which ignores the defense and informs the jury that to constitute malice aforethought no particular time need intervene between the formation of the intention and the act, as a defendant may in self-defense intend to inflict an injury, and if it is necessary or apparently necessary to his defense he will be justified in doing so.

6. SAME—*when conversations leading up to the crime are admissible although both parties were not present.* Where the cir-

cumstances leading up to a homicide occurred before the principals arrived upon the scene and consisted of a fight between certain boys in the neighborhood, the defendant may be permitted to prove what he said to the boys before the deceased arrived and what the deceased said after the defendant had left and before the defendant returned to the scene, when the fatal altercation took place, as the rule excluding conversations in the absence of the parties does not apply to such case.

7. SAME—*objects offered as exhibits must be sufficiently identified.* Where an object is offered in evidence as an exhibit its identity must be disclosed by competent evidence, and merely offering to prove the identity does not make the exhibit competent evidence, but where uncontradicted witnesses for the defendant in a murder trial have identified a certain knife as being the one picked up at the scene of the assault, and which the defendant claims was in the deceased's hand when the defendant struck him, the court should admit the knife in evidence.

8. SAME—*meaning of the word "wound" as a noun.* In medicine the word "wound," as a noun, means an injury affecting either the hard or soft parts of the body, and comprehends bruises, contusions, fractures and luxations, and in law the word means any lesion of the body, as a hurt, loss or injury.

WRIT OF ERROR to the Circuit Court of Saline county; the Hon. A. E. SOMERS, Judge, presiding.

FOWLER & RUMSEY, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, CHARLES H. THOMPSON, State's Attorney, and JAMES B. SEARCY, (W. C. KANE, of counsel,) for the People.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

Frank Durand (herein called the defendant) was convicted in the circuit court of Saline county on May 29, 1922, for the murder of Charles Boone Wilson by throwing and striking him on the head with a piece of brick, and was sentenced to the penitentiary for a term of fourteen years after motions for a new trial and in arrest of judgment were overruled. A writ of error has been sued out of this court to review that judgment.

The uncontroverted facts in this record are the following: About 3:30 in the afternoon of December 26, 1921, in the city of Harrisburg, in the county of Saline and State of Illinois, near a tree in Herbert street a few feet north of Olive street, which latter street runs east and west and crosses Herbert street, running north and south, Everett Oglesby, of the age of thirteen years, and Willie Lane, of the age of about twelve years, engaged in a fist fight with each other. These boys were cousins. The Lane boy was by himself and the Oglesby boy was accompanied by Clyde and Clarence Fricker, his brothers of the half-blood, and by Henry Zeigler, his cousin, and Claude Robinson. The four boys accompanying the Oglesby boy ranged from fourteen to seventeen years. It appears that ill-feeling existed between the Lane boy and the Oglesby boy and had existed previous to that time. The Lane boy challenged the Oglesby boy for a fight and the latter accepted the challenge. As a result of the fight, in the language of the witnesses, the Lane boy got whipped and was left lying on the ground and bleeding when they were separated. The defendant and his wife were cleaning their house on Olive street, about 200 feet west of Herbert street, preparatory to moving into it, they having been very recently married, and he was attracted by the fight and went to where the boys were fighting and separated them, telling them that it was not right to fight. He asked the Oglesby boy to go with him to his house, and the boy started with him and went about half way to the house, the defendant going back to his work. Jeff Lane, father of Willie and uncle of Everett, lived on the east side of Herbert street about 300 feet south of where the fight took place, and at the time the fight was going on he and his sons Fred and Roy, and Hiram Phelps, Edgar Shoemaker and the deceased, were all in Herbert street, about 100 feet north of Lane's home and 200 feet south of the tree, working on an automobile of Loren Phelps, from which point they all had or could have had a clear view

of the fight and the subsequent events that took place near that tree. About the time the fight ended between the two boys Lane's attention was called to the fight and he immediately walked down to the scene of the fight. The Oglesby boy and the defendant were then walking west towards the defendant's house.

There is very much conflict in the evidence as to what took place when Jeff Lane arrived at the place where the fighting occurred. According to the defendant's witnesses, Lane called the Oglesby boy back and told him and his own boy that they must fight again; that they did have a second fight, the result being that the Oglesby boy again got the best of the fight; that after the Lane boy got up he picked up something and was going to throw it at the Oglesby boy, and his father made him desist and sent him and his son Roy home. Lane testified that they did have a second fight and that he did not interfere with them but let them fight it out. About the time these two boys were leaving for home, the deceased, who was a guest at the home of Lane, came from the place where the automobile was located and engaged in conversation with several of the boys. According to the defendant's witnesses, Roy Lane whispered something to the deceased just before he reached the scene of the fight, and the deceased then said to Clarence Fricker, "Here is the little son-of-a-bitch that stole my car tools; I'll just take you up to town and have you arrested," and then grabbed Clarence and choked and kicked him. Clarence got loose from him and ran a short distance, and the deceased picked up a rock and threw at him and ran after him. The deceased also chased the Oglesby boy and threw a piece of shoe at him. He also said to Lane that if he were Lane he would not drive his boys to the house. The deceased then began talking to Claude Robinson while Robinson was leaning with his back to the tree, facing south and a little west, while the deceased was about ten feet of him, facing north and east, and he used some

rough and harsh words while he was talking to Robinson. While they were engaged in this conversation, the defendant, who had been attracted by the noise of the second fight and the events thereafter, left his house and walked in a moderate walk up Olive street to within ten or fifteen feet and to the rear of the deceased and said to him, "You ought not to be choking and running the boys around that way; it is not right." Thereupon the deceased replied, "What would you do if I choked you?" The defendant replied, "I did not come down here for trouble; I separated these boys once." The deceased then immediately drew a knife from his pocket, opened it, and while slightly bent forward, with his eyes fixed on the defendant, started toward him. The defendant began backing away, saying, "Don't come onto me with that knife!" but the deceased continued to pursue him and the defendant continued to back away and repeated to him, "Don't come onto me with that knife!" The defendant then stooped down and picked up a piece of brick, and after backing two or three steps more and repeating his former words of warning threw it at the deceased, who dodged, but the brick struck him a little above and about two inches back of the left ear. The deceased stooped and tried to pick up the brick, then rose up, staggered a few steps backward and fell, with his head within about two feet of the tree. He had a pipe in his hand or in his mouth which he had been smoking and an open knife in his right hand, and the pipe and knife fell to the ground. After he fell the defendant walked toward his home. All of the boys who were with Everett Oglesby, and also Oglesby and John Murrow, a fifteen-year-old boy who came upon the scene about the time the second fight between the boys began, were around and near the defendant and the deceased at this time, and testified, in substance, to the foregoing facts and to the actions and conduct of the deceased and of the defendant after the second fight between the boys was over. These boys were corroborated by the

testimony of the defendant and Mrs. Malone, who was at her home on the north side of Olive street, opposite the defendant's house. The deceased only breathed a very short time after he fell, never spoke, and died before they could get him to the house of Lane, where his body was taken immediately after his death. His skull was fractured and slightly indented and there was a cut and bruise over the fracture. The cut and bruise and fracture were the only wounds on the body according to the testimony of the physicians.

According to the testimony of Jeff Lane for the People, the deceased came to the place where the boys fought just about the time the second fight had ended and at once accused the Fricker boys of stealing his tools from his car. Clarence Fricker then called the deceased a dirty liar, and the deceased immediately took hold of him and shook him, and the boy broke loose and ran. The deceased did not run after him or throw anything at him but walked over south and west of the tree and faced Robinson, who was leaning against the tree, and began talking to him about some tools that he accused the Fricker boys of getting. Lane in his testimony placed the deceased and the Robinson boy, with whom he was talking, in about the same relative positions as did the defendant's witnesses. He further testified that while the deceased and the Robinson boy were talking he looked west and saw the defendant at a distance of about seventy-five or eighty feet from his house running towards them with a piece of brick in his hand, and he watched him from that time until he came within about twelve feet of the deceased, and that he ran something near his best. The witness called nobody's attention to the defendant, and stated that he just stood there and looked on. When the defendant stopped, the first thing he said was, "You damned son-of-a-bitch, why don't you talk to a man instead of these boys?" This remark was addressed to the deceased, who turned, facing the defendant, and said some-

thing in reply, but the witness did not understand what he said. The defendant said nothing more. When he called the deceased a son-of-a-bitch he halted just long enough to brace himself and then threw the brick at the deceased, who turned back as if ducking his head down, and the brick hit him back of and above the ear. The deceased and the defendant were ten or twelve feet apart at that time. The deceased, when hit, staggered in a northwest direction for a second and raised his arm and groaned, and as he staggered he picked up the brick, rose up and went off his feet backwards, and fell with his head nearly against the tree. He had a black pipe in his hand at or just prior to the time the defendant threw the brick. The witness was within fifteen or eighteen feet of the defendant when he threw the missile, and after he threw it he turned around and ran back toward his home. The deceased only breathed about five minutes and never spoke after he was hit. The defendant was running all the time as he came from his home toward the deceased until he stopped within ten or twelve feet of·him, and as he came running up the street Everett Oglesby shouted to him·to "knock his block off." Lane was corroborated in his testimony as to the manner in which the defendant approached the deceased and as to all of his movements and actions while he was throwing the brick, by Virgil Wright, his step-son, who was about half a block away from the scene of the killing; by Lane's son Fred, who was about 200 feet away; by Edgar Shoemaker, who was about 200 feet away; by Lane's wife, who was at her home; and by Hiram Phelps, who was about 200 feet or more away, where the automobile was stationed. These five witnesses could not corroborate Lane as to what was said by the defendant, but some of them heard him say something to the deceased before he threw the brick, and all six of the witnesses are agreed upon the propositions that the deceased at no time pursued and the defendant at no time backed away from the deceased before he threw

the brick, and that he had the brick in his hand when he ran up to the deceased and that he ran away toward his home after he threw it.

Lane testified positively that the deceased did not take a knife out of his pocket and did not have a knife in his hand at any time while facing the defendant or at any time during the trouble. He did testify that his son Willie picked up an open knife near the body of the deceased after he fell and that the boy gave it to him, and that he had the same knife with him and in his pocket at the trial. This knife was identified as the same knife that was picked up by Lane's boy just after the deceased was hit with the brick and had fallen.

The defendant proved a good reputation as a peaceful and law-abiding citizen by a number of witnesses. On rebuttal a witness for the State testified that shortly after the killing the defendant told him, in substance, that he carried the brick with which he struck the deceased from his house as he went to the scene of the killing, which statement was denied by the defendant. Two witnesses testified that Mrs. Malone, shortly after the killing, told them that she told the defendant just before he went to the scene of the killing to go down there and knock the deceased's head off and that if he did not she would, which statements she denied. The Oglesby boy denied telling the defendant, as he was going toward the deceased, "to knock his block off." The brick or missile with which the defendant killed the deceased was described by the various witnesses as being about three or four inches square on its face.

As indicated by the evidence, the sole defense in this case is self-defense, and the claim of the State is that the defendant is guilty of murder. On the evidence the issues are clear cut and very simple, and the question of guilt is one to be determined and finally settled by the verdict of a jury under proper instructions. Twenty-four instructions were given to the jury for the State and twenty-two for

the defendant. Had the number of instructions been reduced one-half and the law correctly applied to the facts, every possible feature of the case could have been covered and the jury have been in a much better position to reach a proper conclusion than by multiplying the instructions. The defendant has complained of the giving of all of the instructions for the People except four, and the complaint is well founded as to a large number of them. It is not our purpose to copy and comment upon the various instructions of which complaint is made. The law of the case is simple and the matter of formulating correct instructions ought not to have been a difficult matter, as every phase of the erroneous instructions has been repeatedly discussed and ruled on by this court in other cases. Accuracy has been sacrificed in this case by the unnecessary work of the State in placing before the jury a great number of instructions instead of confining them to a reasonable number with a correct statement of the law as applied to the particular facts. An abundance of argument and reiteration is contained in the briefs of both parties in discussing propositions of law that are simple and elementary. We do not mean to be unnecessarily caustic concerning this matter, but we feel warranted in saying that this court ought not to be called upon to read more than 200 pages of abstract of the record and 98 pages of briefs and arguments in order to pass upon the merits of this writ of error. We suggest with all due deference to counsel that equally satisfactory results ought to be obtained by curtailing the volume of the abstract and briefs to even less than half of their present volume.

Of the twenty instructions complained of by the defendant, several are inapplicable, loosely drawn and contain incorrect statements of the law and were highly calculated to mislead the jury as to the law governing the case. Instruction No. 13 given for the People is a copy of section 155 of the Criminal Code, and is to the effect that if the jury

believe that the killing has been shown, the burden of proof shifts from the People to the defendant. This is purely an abstract proposition of law, which gives the jury no correct idea of the law of the case or as to how much proof on the question of self-defense is necessary to entitle the defendant to a verdict of not guilty. The law clearly is that the burden of proof never shifts to the defendant no matter what his defense may be, and where the defense is self-defense, it is sufficient if his evidence on self-defense, together with all the other evidence in the case, creates in the minds of the jury a reasonable doubt of his guilt, and there was no instruction given for the People that recognizes this as the law. Besides, some of the instructions given for the People on the law of self-defense are erroneous. The above section of the statute should not be given as an instruction in any homicide case. Had all the other instructions bearing on self-defense been accurate, the giving of this instruction would not necessarily be reversible error, but the giving of a like instruction, with other inaccurate instructions on the law of self-defense, has been held by this court to be reversible error where the defense was simply and only self-defense. (*People* v. *Willy,* 301 Ill. 307.) Instruction No. 10 is simply a copy of sections 148 and 149 of the Criminal Code,—another labor-saving makeshift commonly used in homicide trials that does not give the jury any accurate knowledge of the law of self-defense. This court has held that the giving of instructions like the two above will be sustained where other instructions on the law of self-defense are accurate, but the practice ought not to be resorted to in a case like this. These sections of the statute contain much that is not applicable to this case at all, as the defense of habitation and other defenses therein named are not here in question.

Instruction No. 24 bears on the law of self-defense, and it closes with these words: "If you believe from the evidence, beyond a reasonable doubt, that the mortal blow was

given by said defendant, and it was not necessary or apparently necessary in order to save his own life or to prevent his receiving great bodily harm, then the killing would not be justifiable under the plea of self-defense." The law is, that if it appeared to the defendant, under the circumstances under which he was placed and acting as a reasonable person, that he was in danger of losing his life or of receiving great bodily harm, then he was warranted in using such force as was necessary or apparently necessary to defend himself against the attack of the deceased. The jury were told by the instruction that whether or not the defendant was justifiable under his plea of self-defense depended upon whether or not they believe, beyond a reasonable doubt, from the evidence, that it was necessary or apparently necessary in order to save his own life, etc. The same character of instruction was condemned by this court in *People* v. *Bartley*, 263 Ill. 69, and it was in that case said that it is not a question whether or not the evidence shows the danger to be real or not, but as to what the defendant honestly believed as a reasonable man, etc.

Instruction No. 19 for the People is very erroneous and prejudicial. It tells the jury that before a person "in self-defense can be justified in resorting to a deadly weapon and using it in a deadly manner, it must appear that he was in imminent danger of death or of receiving great bodily harm or that a reasonable person in like circumstances would have believed that he was in peril of losing his life or sustaining great bodily harm, and that he could not have otherwise saved his life or person from great bodily harm." The old doctrine of the common law that the right of self-defense is denied to a man until he has exhausted every effort to escape is not now the law of this State, but the law is that where a person is in a place where he has a lawful right to be and is unlawfully assaulted by another and put in apparent danger of his life or great bodily harm, he need not attempt to escape but may lawfully stand his ground and

meet force with force, even to the taking of his assailant's life, if necessary or apparently necessary to save his own life or to prevent great bodily harm. *Hammond* v. *People,* 199 Ill. 173; *Baird* v. *United States,* 158 U. S. 550.

Instruction No. 7 was an instruction on malice. It clearly ignored the law of self-defense and for that reason was erroneous and harmful. The middle paragraph of the instruction informed the jury that no particular time need intervene between the formation of the intention and the act to constitute malice aforethought. It then stated that it is enough if the intention to commit the act, with a full appreciation of the result likely to follow, was present at the time the act was committed, and that the act was not the result of some sudden heat of passion, provoked in some manner calculated to override the judgment and before sufficient time had elapsed for reason to resume its sway. If there were no plea of self-defense in this case and the question were whether or not the offense was murder or manslaughter the instruction could be viewed from a very different angle, but the defense was self-defense, supported by evidence, if believed by the jury. In self-defense a defendant may intend to inflict an injury, and may actually inflict an injury intentionally, if necessary or apparently necessary to his self-defense, consequently the foregoing instruction is necessarily erroneous and confusing to the jury.

There are other faulty instructions in the record, but it would unnecessarily lengthen this opinion to discuss them, and they have been discussed in the briefs and authorities cited bearing thereon.

There were some errors committed in the admission of evidence. The defendant offered to prove some things that the deceased said and did to the boys just before the defendant returned to the scene of conflict the second time. The court likewise refused to allow the defendant to prove

what he said to the boys when he parted them in their first fight. This evidence was excluded on the ground that both the deceased and the defendant were not present at those times. This rule does not apply to such evidence. The evidence is admissible in both instances for the purpose of characterizing the conduct of the deceased and of the defendant at those times, and to show whether or not the defendant was in the first instance on a peaceful mission, and in the second instance to show whether or not the deceased was in a belligerent state of mind before the defendant came on the ground. This evidence should not have been gone into in greater detail further than already indicated, as the details of the fight between the boys and the actions of the deceased and the defendant with the boys are not material to the issues except for the purposes already indicated.

The knife picked up by Willie Lane at the scene of the killing was offered in evidence as an exhibit by the defendant but was excluded by the court on the ground that it was not sufficiently identified. Up to this point in the evidence it had been testified by several of the witnesses that the deceased had an open knife in his hand at the time he was struck by the defendant. The knife was marked as an exhibit, and one or more witnesses had already testified that the exhibit was the same knife that Willie Lane picked up on the ground. Whether or not the deceased had a knife in his hand was a question for the jury. Whether or not an exhibit of this character is the very thing that was used or played a part in the transaction is also a question for the jury when witnesses assert contrary opinions as to its identity. (*Flanagan* v. *People,* 214 Ill. 170.) There is absolutely no disagreement in the testimony in the record as to whether the knife offered in evidence was the knife found on the ground by Willie Lane, and the court erred in excluding it as an exhibit. We may here state that counsel for the defendant, at the time the court made this ruling,

offered to prove by a number of witnesses that the exhibit was the same knife found on the ground. A witness or two did afterwards testify that the exhibit was the knife in question, but the defendant's counsel did not offer the knife as an exhibit thereafter. In order to get in evidence an exhibit of this character its identity must first be disclosed by competent evidence, and offering to prove its identity is not proving it and does not make the exhibit competent evidence. Counsel thus took chances on the evidence already introduced being sufficient to identify the knife, but, as already stated, we think the evidence was sufficient when the knife was offered as an exhibit.

Defendant's counsel at the close of the People's evidence moved the court to exclude all the evidence and to direct a verdict for the defendant on the ground of a variance between the indictment and the proof. Every count in the indictment charged that the deceased received a mortal wound on the left side of the head at the hands of the defendant, from which he instantly died. It is the claim of the defendant that there is no proof of a wounding of the deceased by the defendant, and that for that reason he could not have died from a wound. A wounding was clearly proved and there is no variance. In medicine the word "wounds" means injuries of every description that affect either the hard or soft parts of the body, and it comprehends bruises, contusions, fractures, luxations, etc. In law the word means any lesion of the body, and the correct definition of a lesion is a hurt, loss or injury. (2 Pope's Legal Definitions, 1684; *Thompson* v. *Loyal Protective Ass'n,* 167 Mich. 31.) Under the statute of 9 Geo. IV, (chap. 21, sec. 12,) it has been held in England that in criminal cases to make a wound there must be an injury to the person by which the skin is broken through. (2 Bouvier's Law Dict. p. 851.) The decisions under this statute have no binding force in this State, as the statute in question was never the law in this State.

There are other errors assigned and argued, but it is not necessary to consider them here, as they cannot arise again on the next trial.

For the reasons aforesaid the judgment of the circuit court is reversed and the cause is remanded.

*Reversed and remanded.*

---

(No. 15203.—Reversed in part and remanded.)
ALVIN FISHER *et al.* Defendants in Error, *vs.* SIMON G. BIRKEY *et al.* Plaintiffs in Error.

*Opinion filed April 18, 1923.*