THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. REED PITCHFORD, JR., Defendant-Appellant.

First District (3rd Division)   No. 61434

Opinion filed June 3, 1976.

Samuels and Weininger, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Linda Ann Miller, Assistant State's Attorney, of counsel), for the People.

Mr. PRESIDING JUSTICE MEJDA delivered the opinion of the court:
Defendant was charged by indictment for the murder on June 30, 1973, of Betty Taylor. After a bench trial he was found guilty of murder and sentenced to a term of 14 to 20 years in the Illinois State Penitentiary. On

appeal he contends that the State failed to prove beyond a reasonable doubt that he was guilty of murder and that he was not acting in self-defense. We affirm. The pertinent evidence follows.

Albert Cobbins testified for the State. He had been acquainted with both defendant and Betty Taylor. On the night of the shooting he met Betty at a tavern where they remained for about 5 hours. When he took her home at approximately 4 a.m., he noticed defendant's car parked near her apartment. He left Betty at the front door of her apartment at about 4:30 and went to stay with Leonard Brooks who lived across the hall. At about 5 o'clock, Mary Adams, Betty's sister, summoned them and they went with her to Betty's apartment. Cobbins went into the bedroom alone where he saw Betty lying on the bed and defendant lying on the floor. He stayed only long enough to check her pulse. He did not see a gun. After he joined the others in the living room the police arrived.

Cobbins also testified that on June 2, 1973, about 4 weeks before the incident, he had stopped at Betty Taylor's home to make a telephone call. At that time he saw her and defendant fighting. Defendant bit and struck her and threatened more than a dozen times to kill her. After the fight he had blood on his face and some of his teeth were missing; Betty's face was bruised and bleeding from the nose and mouth. Cobbins drove defendant home in defendant's car, then went next door to Earl Taylor's home where he saw defendant a half hour later with a .22-caliber gun in his hand. Defendant said he was going to kill "that bitch," and put the gun in his right pocket. The three men drove away together in Earl Taylor's car. Before Cobbins was dropped off he heard defendant tell Earl Taylor not to stop at Betty's house if the police were there, and he heard defendant again say that he was going to kill her.

Mary Adams testified for the State. She lived with her sister Betty, another sister, and Betty's small son by defendant. She arrived home about 6 hours before the shooting; she watched television alone in the living room and did not see Betty or know when she came home. About 4:30 in the morning she turned off the television, and while lying on a couch near the door to Betty's room she heard the telephone ring at 5 o'clock; about 5 minutes later she heard Betty admit defendant into the apartment. When he walked in he was not carrying anything; the two of them walked past her into the bedroom and closed the door. She heard Betty say, "Don't R.C. [defendant's nickname], don't load the gun in this room." She saw defendant walk in and out of the bathroom, and he was not carrying anything. When he returned to the bedroom, leaving the door open, she heard Betty say, "R.C., don't do this," and a few seconds later she heard four or five shots. On cross-examination she could not recall whether the shots were in rapid succession. After hearing the shots she ran to the front door and called Betty about three times, then ran to

the bedroom door where she saw her sister lying on the bed with her head on the pillow. Defendant was bleeding from the mouth and kneeling on the floor next to the bed with his head and chest on Betty's stomach. She did not see a gun. She then ran to another bedroom and called the police, then summoned Cobbins and Brooks from across the hall. When the three returned to her apartment Cobbins entered the bedroom alone; she never went back in there. Mary also testified that on June 2, 1973, she had noticed that Betty had a black eye. She had seen defendant beat Betty with his fists on January 1, 1973.

Officer Michael Murphy testified for the State. He is an investigator with the Chicago Police Department. When he arrived at the scene of the shooting at about 5:25 a.m., uniformed police were there. He observed four expended cartridge casings on the floor beside the bed and a .38 blue steel revolver about 14 to 18 inches under the bed with another spent cartridge casing some 12 inches from the gun. He saw bloodstains on the floor and on the bed. He also saw a bullet hole in the ceiling directly above the headboard and a .38-caliber bullet on the bed. He did not examine the trajectory of the bullet hole in the ceiling. The gun, together with the cartridge next to it, was moved closer to the edge of the bed after he arrived and before being photographed by the police. He saw the gun dusted for fingerprints, but none were found. The gun, which was locked, was then opened in his presence; an expended cartridge was directly under the hammer and the other chambers in the cylinder were empty. The gun was a .38-caliber break-open revolver which must be broken open to remove expended cartridge casings.

Dr. Culala, a coroner's pathologist, testified for the State. The deceased had received four bullet wounds, three in the head and one in the left hand. The hand wound was through the first web of the left hand, the bullet having exited from the palm side. One of the head wounds was caused by a bullet which entered the upper left portion of the head and was recovered from the tissue on the right side of the neck. Another was a through-and-through wound caused by a bullet entering near the left upper lip and going out from the right cheek. The bullet which caused death entered the head in the area of the left ear, followed a downward trajectory, and was recovered from the brain stem. Two complete bullets and a fragment were removed from the head of the deceased; all bullets entered from the front while she was alive.

It was stipulated by the parties that if John Sadunas, a ballistics expert, testified he would state that the bullet recovered from the bed and the five casings were fired from the .38 revolver which was the only weapon found at the scene, and that the three bullets recovered from the body were ballistically similar to the weapon. It was stipulated that the gun was a 6-shot .38-caliber revolver registered to defendant; that there was one

spent .38 cartridge in the chamber; and that the gun and the cartridge casing in it were destroyed by the Chicago Police Department about 3 weeks after the shooting. It was further stipulated that if Dr. Andaya were called he would testify that defendant sustained a bullet wound through the left upper lip, with the bullet traveling in an upward direction and lodging in the left ear canal.

Willie Redmond, Betty Taylor's brother-in-law, testified for the defense. He has known defendant and Cobbins all his life, and Betty for about 6 or 7 years. On several occasions he saw the three of them together at Betty's house but he also saw Cobbins and Betty alone together many times. On June 2 he noticed defendant had some teeth missing and had a scar on his forehead; the injuries appeared to be recent.

Charlie Jenkins testified for the defense. He works about three blocks from defendant's home and has known him for about 12 years. Defendant's reputation in the community is good.

Reed Pitchford, Jr., defendant, testified in his own behalf. On June 30, 1973, he left work at 12:45 a.m., dropped his check off at home with his wife, went out to eat, and drove to Betty Taylor's home. He had received two telephone calls from her before leaving work. No one was there when he arrived, so he parked his car and dozed off in the front seat. He awoke at about 3:50 a.m., telephoned Betty, and went to her apartment about 5 minutes later. When she let him in they went to her bedroom and talked for about 20 minutes. He had left a .38-caliber gun there while he was out of town so that his children would not have access to it. He took the gun out of a clothes hamper in the bedroom where he had previously left it, put the cylinder in and laid the gun on the night stand next to the bed. When Betty asked if it was loaded he said it was. He then went to the bathroom and when he returned Betty had the gun; he took it from her and laid it back on the night stand. Betty was lying on the bed and defendant sat on the bed facing her with his head down. He testified "She told me, don't fool around with her and play her for no other woman." He told her he could not spend so much time with her. When he looked up she was pointing the gun at him and shot him just above the lip. The force knocked him to the foot of the bed, and as he pulled himself up he knocked the gun from her hand onto the bed, picked it up and fired at her. She was still lying on the bed as he fired from above. He remembered firing one shot, but nothing thereafter until he awoke 7 or 9 days later in the hospital. One June 2, 1973, about 4 weeks before the shooting, he was teasing Betty and she hit him on the forehead, causing a scar; she also hit him in the mouth, causing him to lose some teeth. On cross-examination he testified that at that time he hit her a couple of times, possibly once in the eye; he denied ever threatening to kill her or carrying a .22-caliber gun on June 2.

It was stipulated by the parties that if Dr. Andaya, who examined and treated defendant at St. Anthony's Hospital, were to testify he would state that on June 30, at about 5:30 a.m., defendant was conscious but shaking when brought into the hospital immediately after the shooting. It was further stipulated that if Investigator Murphy were called he would testify that subsequent to leaving the scene of the shooting he had a conversation with defendant in the intensive care unit of the hospital and that defendant was then conscious and alert.

■■ On appeal, defendant contends that he acted in self-defense and that he was not proved guilty beyond a reasonable doubt. In section 7—1 of the Criminal Code (Ill. Rev. Stat. 1973, ch. 38, par. 7—1) it is stated:

"§7—1. Use of Force in Defense of Person.] A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony."

The elements of self-defense are: (a) force is threatened against defendant; (b) defendant is not the aggressor; (c) danger of harm is imminent; (d) the force threatened is unlawful; and (e) defendant reasonably believes that a danger exists, that the use of force is necessary to avert the danger, and that the kind and amount of force which defendant uses is necessary. Further, defendant could use deadly force only if he reasonably believed such force was necessary to prevent imminent death or great bodily harm to himself. (*People v. Williams* (1965), 56 Ill. App. 2d 159, 165, 205 N.E.2d 749.) When evidence of self-defense is introduced into a homicide case, whether as part of the State's case or as a result of an affirmative defense interposed by defendant, the burden of proving guilt beyond a reasonable doubt as to the issue of self-defense, as well as other necessary elements of the charge, remains upon the State. (*People v. Graham* (1971), 2 Ill. App. 3d 1022, 279 N.E.2d 41.) The burden of proof never shifts to the defendant, and when he pleads self-defense it is sufficient to acquit him if his evidence, together with all other evidence in the case, creates a reasonable doubt of guilt. *People v. Durand* (1923), 307 Ill. 611, 139 N.E. 78.

■■ Defendant testified that Betty Taylor was the aggressor in that she had possession of the gun and fired the first shot which struck him in the left side of the face, through the upper left lip, and the bullet lodged behind his left ear. It has been held that the trier of fact is not compelled to accept defendant's statements but may consider the probability or

improbability thereof and the surrounding circumstances; and furthermore, a reviewing court will not substitute its judgment for that of a trier of fact because the testimony is conflicting. (*People v. Hall* (1975), 25 Ill. App. 3d 992, 324 N.E.2d 50.) However, if after considering all of the evidence there remains reasonable doubt of defendant's guilt, a reviewing court will reverse a conviction. (*People v. Dougard* (1959), 16 Ill. 2d 603, 158 N.E.2d 596.) When a defendant submits the only version of what occurred, the trier of fact may not disregard the account if the testimony is not improbable, nor uncorroborated, nor contradicted in its material parts. (*People v. Jordan* (1954), 4 Ill. 2d 155, 122 N.E.2d 209.) However, the trier of fact is not required to accept defendant's account of the events but may consider all of the surrounding circumstances and the improbabilities of the matters testified to by defendant. (*People v. Kendricks* (1972), 4 Ill. App. 3d 1029, 283 N.E.2d 273.) Defendant argues that his testimony as the only eyewitness is uncontradicted and fully corroborated on every material point, and that the State failed to rebut beyond a reasonable doubt his testimony of self-defense. The State argues, however, that a finding of guilt is supported by the testimony of Cobbins and Mary Adams, and by the physical facts. It is our duty to examine all the evidence in the record before us to determine whether there is a reasonable doubt of defendant's guilt.

Cobbins was not in deceased's apartment at the time of the shooting and therefore had no knowledge of who had possession of the gun, or even as to what transpired between defendant and deceased at the time. However, both Cobbins and defendant testified that about a month prior to the shooting, defendant and Betty Taylor had an argument. Cobbins testified that he saw defendant strike Betty at that time and that she was bleeding from the nose and mouth, although he later also noticed some blood on defendant's face. Defendant testified that during this argument Betty had scarred his forehead and knocked out his front teeth. Mary Adams testified that on the day of the argument she saw that Betty had a black eye. Willie Redmond testified that on that date he noticed that defendant was scarred, that some of his teeth were missing, and that the injury appeared to be recent. Cobbins testified that at the time of the prior argument defendant had repeatedly threatened to kill Betty and that defendant was carrying a .22 gun on that date. Defendant denied saying this and denied carrying a .22 gun on June 2. We find that the trial court may reasonably have believed Albert Cobbins' testimony as to the argument of June 2, which tends to establish a motive for the June 30 shooting.

Mary Adams testified that she overheard two statements made by Betty while defendant was in the bedroom; that before defendant left the bedroom to go to the bathroom Betty had said, "Don't, R.C., don't load

the gun in this room." As to this conversation, defendant testified that Betty Taylor had asked him if the gun was loaded after he put the cylinder in it. Mary Adams also testified that after defendant returned from the bathroom and just before the shooting, Betty had said "R.C., don't do this." As to this conversation, defendant testified as follows: "She told me, don't fool around with her and play her for no other woman." We find that the trial court as trier of fact may reasonably have believed Mary Adams' testimony as to the conversations which tend to establish that defendant was the aggressor.

Officer Murphy testified as to the position of the gun and expended cartridge casings as he first saw them, upon his arrival. He testified that as he entered the bedroom he observed four expended cartridge casings on the floor beside the bed, and also a gun lying about 14 to 18 inches under the bed, with another spent cartridge casing lying about a foot from the gun. Officer Murphy further testified that the gun he examined at the scene had to be broken open to remove the casings. Mary Adams could not recall the sequence of the shots she heard, that is, whether or not they followed in rapid succession; however, she testified that upon hearing the shots she ran to the front door and called Betty, then ran to the bedroom door where, although she did not see the gun or casings, she saw Betty had been shot and that defendant was slumped over her with blood running out of his mouth. No further shots were heard, which would establish that defendant had already sustained his injury before Mary Adams came to the door. Based upon this evidence, the trial court may reasonably have concluded that it was defendant who removed the casings in a conscious effort after the shots were fired. Officer Murphy also testified that a bullet hole was found in the ceiling above the head of the bed. Since additionally one bullet was removed from defendant's wound, two bullets and a fragment from the deceased, and one expended bullet was found on the bed, the bullet hole in the ceiling only corresponds to the fact that six expended shell casings were found. However, since no trajectory was determined in relation to the bullet hole in the ceiling, we cannot say that its existence corroborates either a theory of murder or of self-defense.

The State argues that even if defendant's testimony is taken as true that Betty Taylor shot him first, his act thereafter in killing her was still nothing less than murder, and that once he disarmed her he was not justified in using deadly force against her. Defendant argues that if his testimony is taken as true that Betty shot him first and inflicted a serious head injury, his act of gaining possession of the gun and shooting his assailant even four times may under the circumstances come within the scope of justifiable use of deadly force, since he could have reasonably believed at that time that his only recourse was to kill in order to avoid being killed.

He testified that he remembered firing one shot at Betty, although she in fact sustained four bullet wounds. He then testified that he does not recall anything thereafter until 7 or 9 days later when he woke up in the hospital. However, we note that it was expressly stipulated that he was conscious and alert at the hospital shortly after the incident when he talked with both hospital staff and police. We find that the trial court could have reasonably believed defendant was conscious throughout the entire incident and that he was therefore not justified in shooting Betty. A person "is not justified in shooting or employing a deadly weapon against his antagonist after the latter has been disarmed or disabled" (*People v. McBride* (1970), 130 Ill. App. 2d 201, 208, 264 N.E.2d 446).

■■ Defendant also argues that where proof is entirely circumstantial, any reasonable hypothesis arising from the evidence consistent with the innocence of defendant must be adopted. (*People v. Calhoun* (1972), 4 Ill. App. 3d 683, 281 N.E.2d 363.) In such cases, where there is no question of defendant's connection with the event, "[t]he issue is the credibility of the defendant in the light of the evidence of physical facts and the evidence contradicting his testimony" (*People v. Russell* (1975), 29 Ill. App. 3d 59, 63, 329 N.E.2d 450). The trier of fact is entitled to disbelieve defendant's testimony and need not disregard the inferences which flow from the other evidence nor search for " '* * * a series of potential explanations compatible with innocence, and elevate them to the status of reasonable doubt.' " *People v. Benedik* (1974), 56 Ill. 2d 306, 309, 307 N.E.2d 382.

■■ In the instant case the trial court as trier of the facts rejected defendant's version of the events as it was entitled to do. Based thereon and upon an examination of all the testimony of the witnesses and the physical facts presented, the record amply supports the trial court's finding of defendant's guilt beyond a reasonable doubt. There is no basis for disturbing the finding.

Accordingly, the judgment and sentence of the circuit court of Cook County are affirmed.

Affirmed.

DEMPSEY and McGLOON, JJ., concur.