THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ENOCH STOKES, JR., Defendant-Appellant.

First District (5th Division)    No. 80-1578

Opinion filed December 28, 1981.

Lebert Bastianoni, of Bastianoni, Meczyk and Associates, of Glenview, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Richard F. Burke, and Barbara A. Levin, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LORENZ delivered the opinion of the court:

Following a bench trial, defendant was convicted of two counts of aggravated battery and one count of armed violence, and sentenced to six years in the penitentiary. He raises the following issues on appeal: (1) the trial court erred in denying defendant's motion to quash his arrest and suppress the evidence; (2) the State failed to prove beyond a reasonable doubt that he did not act in self-defense; (3) his conviction for armed violence should be vacated since it is based upon aggravated battery and is thus "doubly enhanced" in violation of his constitutional rights; and (4) the armed violence statute violates his right to equal protection.

The following testimony was adduced at trial.

Naomi Mixon testified that on January 5, 1980, she had dinner with her son at their home and later visited her sister on South Christiana Avenue in Chicago. Then she went to a lounge at 3700 West Roosevelt Road. At about 9 p.m., defendant, one of the patrons at the lounge, offered to give her a ride to her home. The two left the lounge and stopped at defendant's home so that he could change his shoes. While there, Mixon telephoned her son. After she got off the phone, defendant struck her on the arm with his fists, causing her to fall on his bed. He continued to strike her with his fists and then cut her on the foot, hands and head with a machete. Defendant forced her to have oral and vaginal intercourse with him.

The next thing Mixon remembered was being at home. After initially refusing medical treatment that evening, she was taken to the hospital and was treated for her injuries. Later, she was met by police officers who brought her to the police station.

On cross-examination, Mixon admitted to having seen defendant on several occasions at the store she frequented, but denied visiting his apartment in the rear of the store or drinking beer while in the store. At trial, she stated that she took off her clothes *after* being struck and cut by defendant. However, at the preliminary hearing, her testimony was that she disrobed *before* he hit her with the machete.

Kerry Harris, Mixon's 15-year-old son, testified that at about 9 p.m.

on January 5, 1980, his mother called him. He did not see her until 4 a.m. the next morning. When she arrived home, her pants were bloody, her head was wrapped in a towel, and she was cut "from head to toe."

Doctor Jurg Tauber testified that he treated Mixon at the emergency room of the University of Illinois Hospital on January 6, 1980. She had two deep lacerations: one on the scalp which was down to the bone and one on the left heel. The woman also had superficial lacerations on the left thumb and right hand, and numerous bruises over her entire back, the lower extremities, the buttocks and the left shoulder.

Investigator Fred Stone of the Chicago Police Department testified that at about 1 on the morning of January 6, 1980, he arrived at defendant's apartment with two other police officers. As they approached the building, Stone noticed that the apartment lights were on, and saw a person peering out of the window. Red stains resembling blood were on the stairs near the entrance to the apartment. With guns drawn, the police officers knocked on the door and announced their office. Defendant answered the door and identified himself. He was placed under arrest, handcuffed and put on a chair in the kitchen. After Stone gave defendant *Miranda* admonishments, he saw blood on the floor and on the sheets of a bed in a bedroom adjacent to the kitchen.

Stone asked defendant about the blood, and the latter responded that no one was injured and that he had been alone for the last 24 hours. A trail of blood stretched from the kitchen to the bedroom. Poking his head into the bedroom, Stone saw a blood-stained machete hanging "in plain view" in a closet without doors. Evidence technicians were called in to "process the scene." When defendant was told that the blood was to be tested to determine whether it was human, defendant initially stated that the blood came from an animal slaughtered pursuant to his job as a part-time butcher, but then said that some of the blood could be his own, due to an injury he suffered. The bloody machete and bedsheets were confiscated and defendant was taken to the police station.

At the police station, defendant was readmonished of his *Miranda* rights. He then gave the following story: on the night in question he met Mixon, went to his apartment and had sex with her. Before taking her home, he noticed that money was missing from his wallet. He confronted her and demanded his money back, but she refused. A fight ensued during which she was injured.

After the parties entered into a number of stipulations concerning physical evidence and tests conducted thereon, the State rested its case in chief.

Defendant testified on his own behalf that he lived in an apartment at the rear of a store at 1801 W. 13th Street in Chicago. He had known Mixon for about nine months and had sex with her on four occasions. On one

occasion, he caught Mixon attempting to steal food from the store and he ejected her from his apartment.

On January 5, 1980, at around 7 p.m., defendant went to Mixon's apartment for a visit. When she asked for a beer, the two got into his car and bought a couple of six packs. Then they returned to her apartment and drank the beer. Mixon told him that she wanted to go dancing. Before doing so, the couple stopped at the home of Sterling Monroe, a friend of defendant. They arrived at Monroe's at 8 p.m., and defendant engaged in a dice game with some of the people there. Later, the two returned to his apartment so that he could change into a pair of cowboy boots, and then went to a lounge at 3719 Roosevelt Road in Chicago, arriving at about 10 p.m.

Defendant and Mixon went to the rear of the lounge and sat at a small bar with Arthur Funches, another one of defendant's friends. The couple danced and mingled, and left the bar sometime between 12 p.m. and 1 a.m. to go to defendant's home. That day, defendant was carrying about $600 in his wallet.

After arriving at his apartment, the two had a drink, listened to music and then had sexual intercourse. At about 4:00 that morning, Mixon asked defendant to take her home. Defendant used the washroom, and upon his return noticed that his wallet, which was on the dresser, was empty. He demanded the return of his money, but she stated that she did not have it. Defendant grabbed the woman, tearing her jacket pocket and causing money to fall out. The two struggled in the kitchen and she grabbed a machete and started swinging it at him. Defendant threw a dish rack and chairs at her, hit her with a mop handle, wrestled her to the floor and got on top of her. Then, he gained control of the machete and struck her with it. Defendant turned on the kitchen light, saw that she was bleeding, carried her into the bedroom and put towels on her head in an attempt to stop the flow of blood. After she refused to be taken to the hospital, defendant drove her home. He was arrested by the police the following day.

On cross-examination, defendant stated that Mixon struck him with the machete several times, but that he, "during a rage," hit her only once. He also stated that there was broken glassware on the kitchen floor which may have cut the woman's foot.

Sterling Monroe testified that defendant came to his home with a woman on January 5, 1980. Defendant arrived at 8 p.m., won about $200 in a dice game, and left with his companion about an hour and a half later.

Frank Maney, defendant's friend, stated that he was at the dice game at Monroe's home on the night in question and saw defendant arrive with Mixon, whom he knows. Maney testified to having seen Mixon on occasion at the store behind which defendant lives.

Arthur Funches corroborated defendant's testimony that defendant and Mixon were at the bar at 3719 Roosevelt Road on January 5, 1980. The two left the bar at about 12 p.m.

Robert Lewis, defendant's landlord and the owner of the store, testified that he had known Mixon for about six months. According to Lewis, she went to the store about three or four times per week and had been in defendant's apartment several times.

In rebuttal, the State offered the stipulated testimony of Investigator Stone that Sterling Monroe on January 7, 1980, told him that defendant arrived at his home alone on the night of the incident. Monroe was not certain of the time that defendant left his home and did not know whether anyone was with him. He was not acquainted with Naomi Mixon.

OPINION

Defendant first contends that the trial court erred in denying his motion to quash the arrest and suppress the machete and bloody bedsheet that were seized by the police. He maintains that the court should not have summarily denied the motion on the basis that there had been no showing: (1) that incriminating items had been "seized" by the police, and (2) that the State intended to introduce these items into evidence. Defendant also asserts that the warrantless arrest in his home and the attendant search of the premises were illegal. Since the fruits of this search were allegedly "major factors" in defendant's conviction, defendant urges reversal of his convictions.

■■ In a proceeding on a motion to suppress evidence, the burden of proving that the search and seizure were unlawful is on the defendant. (*People v. Williams* (1973), 16 Ill. App. 3d 440, 306 N.E.2d 678.) However, the burden of proving the validity of the arrest is shifted to the State when a defendant shows he was doing nothing unusual at the time of his arrest, and he makes a *prima facie* case that the police lacked probable cause to arrest him. *People v. Moncrief* (1971), 131 Ill. App. 2d 770, 268 N.E.2d 717.

■■ It is evident from defendant's testimony at the suppression hearing that he was doing nothing unusual at the time of his arrest, and that the police had no warrants of any kind when they entered his home and searched for evidence without his consent. Thus, defendant sustained his burden of establishing a *prima facie* case that the police lacked probable cause, and the burden of proving justification for the search shifted to the State. Therefore, the trial court erred in summarily denying defendant's motion.

■■ We disagree with the trial court's conclusion that a "seizure" was not established by defendant's testimony at the hearing. First, defendant testified that the machete and bloody sheet were present in the apartment

when the officers arrived and searched his apartment. Subsequent to the arrest, he returned and found that the items were missing. This testimony provides circumstantial proof that the items were confiscated by the police during the search. Second, the State's answer to discovery, filed prior to the suppression hearing, listed both items as physical evidence that "may be used at trial." This evidence was subsequently admitted at trial over defendant's objection. Thus, the "seizure" of the evidence was admitted by the State. Third, we know of no requirement that defendant establish, at a suppression hearing, that he actually witnessed the police remove incriminating evidence from the premises. Frequently, the search of the premises and the confiscation of evidence occurs outside the range of the suspect's immediate vision, or transpires in his total absence. In these cases, it is impossible for the suspect to testify that he actually saw the police remove the items. Thus, he has no burden to do so in establishing a *prima facie* case at the hearing on the motion to suppress.

However, although the trial court erred in denying the motion to suppress, the error does not warrant a reversal of defendant's conviction. It is clear that the admission of illegally obtained evidence in a criminal trial following the erroneous denial of a motion to suppress is subject to the harmless error rule. *Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824; *People v. Clark* (1977), 55 Ill. App. 3d 379, 370 N.E.2d 1111, *cert. denied* (1978), 439 U.S. 858, 58 L. Ed. 2d 165, 99 S. Ct. 173.

■■ Under the circumstances of this case, we believe that the admission of the machete and bloody sheet into evidence was harmless beyond a reasonable doubt. First, the existence of these items was established by defendant's testimony. Defendant admitted at trial that he struck the victim with a machete while she was in his apartment that night, that she was injured and bleeding because of his actions and that he later placed her on the bed. Since defendant's own testimony shows that a machete was used on the victim and that the bedsheet was bloody, the admission of these two items into evidence does not prejudice him. Second, the victim testified that defendant struck her with the machete, and the medical evidence corroborates her description of the severity of the wounds suffered as a result of this attack. Therefore, the admission of the machete and bedsheet adds little to the State's case. Finally, since defendant was tried by the trial court rather than by a jury, any inflammatory impact of the seized items was substantially reduced.

Defendant argues that the State failed to prove beyond a reasonable doubt that he had not acted in self-defense in striking the victim with the machete. We disagree.

A person may use such force in self-defense as is likely to cause death or great bodily harm to another only if he reasonably believes it necessary

to prevent imminent death or great bodily harm to himself or another. (*People v. Peeler* (1973), 12 Ill. App. 3d 940, 299 N.E.2d 382.) One is not justified in employing deadly force against an antagonist after the latter has been disarmed or disabled. *People v. Pitchford* (1976), 39 Ill. App. 3d 182, 350 N.E.2d 170.

■■ The victim's testimony clearly shows that defendant did not act in self-defense when he struck her. Rather, it establishes that defendant could not have reasonably feared death or great bodily harm when he attacked her. According to the victim, defendant demanded that she undress. When she refused, he struck her with his fists and later with the machete. She had no weapon at this time and did not threaten the defendant. The trial court implicitly found this testimony to be credible in finding defendant guilty of aggravated battery and armed violence.

Moreover, even defendant's testimony shows that his use of force was not justified. Basically, he stated that he caught the victim stealing his money, and that she refused to return it. As they fought on the floor, she grabbed the machete and tried to hit him, but he gained control of the weapon. While on top of her, he struck the woman "during a rage." We believe that under this version of the facts, defendant could not have reasonably believed that deadly force was authorized, since the woman had been disarmed and posed no threat to him. See *Pitchford; People v. McBride* (1970), 130 Ill. App. 2d 201, 264 N.E.2d 446.

Finally, defendant contends that his conviction for armed violence should be vacated. First, he asserts that this conviction is based upon the underlying felony of aggravated battery and that there is thus a "double enhancement" of the aggravating factor of being armed.

Defendant was convicted of two counts of aggravated battery; one count for causing great bodily harm to the victim and one count for committing a battery upon her using a deadly weapon. (Ill. Rev. Stat. 1979, ch. 38, pars. 12—4(a), 12—4(b)(1).) Initially, the trial court also found defendant guilty of armed violence (Ill. Rev. Stat. 1979, ch. 38, par. 33A—2) based upon the two counts of aggravated battery. However, on defendant's motion, the judge later vacated the finding of guilty on the count of armed violence based upon the aggravated battery—use of a deadly weapon count, on the very basis that defendant now complains.

We believe that the trial court correctly vacated the armed violence conviction based upon the aggravated battery—use of a deadly weapon count. Likewise, the trial court did not err in permitting the armed violence conviction based upon aggravated battery—great bodily harm, to remain intact. In *People v. Haron* (1981), 85 Ill. 2d 261, 422 N.E.2d 627, our supreme court specifically addressed this very issue. There, defendant was convicted of aggravated battery for use of a deadly weapon, and

armed violence based thereon. In finding that there was double enhancement from the single use of the weapon, the court stated:

"Our review of the language of the statute and the authorities leads us to conclude that the General Assembly did not intend that the presence of a weapon serve to enhance an offense from misdemeanor to felony and also to serve as the basis for a charge of armed violence. In our opinion the requirement of section 33A—2 that there be the commission of a felony while armed with a dangerous weapon contemplates the commission of a predicate offense which is a felony without enhancement by the presence of a weapon." *Haron*, 85 Ill. 2d 261, 278, 422 N.E.2d 627, 634.

■■ In the present case, of course, there is no "double enhancement" problem because the armed violence conviction is based upon aggravated battery—great bodily harm. The use of a weapon is only employed *once*—as an element of the armed violence conviction. Thus, the armed violence conviction is based upon the commission of a predicate offense which is a felony without the presence of a weapon and is therefore proper.

Defendant also asserts that the armed violence statute violates equal protection since it mandates dissimilar treatment for similarly situated persons. In other words, it is argued that the statute draws an improper distinction between unarmed and armed felons and treats the latter group more severely.

■■ The equal protection clause does not deny the States the power to treat different classes of persons in different ways. (*Eisenstadt v. Baird* (1972), 405 U.S. 438, 31 L. Ed. 2d 349, 92 S. Ct. 1029.) The clause requires equality between groups of persons "similarly situated"; it does not require equality or proportionality of penalties for dissimilar conduct. (*People v. Bradley* (1980), 79 Ill. 2d 410, 403 N.E.2d 1029.) The armed violence statute, in treating armed felons more severely than unarmed felons, does not violate equal protection since the two groups are not "similarly situated." A person armed with a dangerous weapon during the commission of a crime is obviously in a different class than one who commits the crime without a weapon. The presence of the weapon on the person of the armed offender, even if it is not used, escalates the potential for violence and may serve to traumatize the victim. More severe treatment of offenders in this class, as opposed to the class of unarmed offenders, is entirely rational. The equal protection clause does not require proportionality of penalties between these two classes of persons since the conduct in each case is dissimilar.

Defendant maintains that dissimilar treatment for those "similarly situated" may arise since armed felons who commit nonviolent felonies,

such as perjury or forgery, are treated differently than those who commit violent crimes, like aggravated battery. This contention is without merit.

The armed violence statute plainly states that a person is guilty of this offense when, "* * * while armed with a dangerous weapon, he commits *any* felony defined by Illinois law." (Emphasis added.) (Ill. Rev. Stat. 1979, ch. 38, par. 33A—2.) Perjury and forgery are both felonies under Illinois law. (Ill. Rev. Stat. 1979, ch. 38, pars. 32—2, 17—3.) Therefore, a plain reading of the statute shows that one may be found guilty of armed violence if, while armed with a dangerous weapon, one commits perjury or forgery. Thus, felons committing these two offenses while armed are treated the same as armed felons who commit violent crimes.

Finally, the State asks this court to remand this case for sentencing on the convictions for aggravated battery, since the trial court only sentenced him on the armed violence conviction, finding that the former offenses "merged" with the latter.

However, our review of the record shows that the trial judge instructed that six-year concurrent sentences were to be imposed upon each of the three convictions. The convictions for two counts of aggravated battery and one count of armed violence arose from separate physical acts by the defendant. These acts are evident in the multiple wounds suffered by the victim. Since the offenses are based upon different acts, they do not "merge."

Multiple convictions and concurrent sentences are proper in cases where defendant has committed several acts despite the interrelationship of these acts. (*People v. Myers* (1981), 85 Ill. 2d 281, 422 N.E.2d 620.) Since we believe that the trial court already sentenced defendant on the aggravated battery convictions, there is no need to remand this case for further sentencing.

Therefore, the judgment of the circuit court is affirmed.

Affirmed.

SULLIVAN, P. J., and MEJDA, J., concur.